2024 IL App (1st) 220842-U

No. 1-22-0842

Order filed September 27, 2024

SIXTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 03 CR 15688 |
| | ) | |
| CHRISTOPHER MCATEE, | ) | |
| | ) | Honorable Michael McHale, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court, and Justice Oden Johnson concurred in the judgment. Presiding Justice Tailor concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*: Petitioner made a substantial showing of a constitutional violation with respect to his claims of ineffective assistance of trial and appellate counsel for failure to investigate and call three witnesses at the second stage proceedings, and his actual innocence claim surpassed directed verdict at the third stage proceedings. We therefore reverse and remand those claims for a new third stage evidentiary hearing.

¶ 2    Petitioner Christopher McAtee appeals from the circuit court's denial of his claims of ineffective assistance of trial and appellate counsel at the second stage postconviction proceeding and from the court's granting of the State's motion for a directed finding following a third stage evidentiary hearing on his claim of actual innocence. For the following reasons, we reverse and remand for a new third stage evidentiary hearing.

¶ 3                                  I. BACKGROUND

¶ 4    The record shows that Christopher was indicted for six counts of first-degree murder, one count of attempted first-degree murder, one count of aggravated discharge of a firearm, and two counts of unlawful use of a weapon following the June 24, 2003 fatal shooting of Racquel Torres on the northwest side of Chicago.

¶ 5    Trial was set for June 19, 2006, but was continued. On September 6, 2006, defense counsel filed a pretrial motion *in limine* seeking to admit the audiotaped statement of Fred McAtee (Fred), Christopher's brother, who confessed to Raquel's murder. The recorded statement was obtained by Christopher's attorneys on December 17, 2003, while Fred was living in Eau Claire, Wisconsin. Trial was reset for October 23, 2006.

¶ 6    On October 19, 2006, defense counsel filed a motion requesting a three-week continuance, along with a request for issuance of a "certificate under seal" to compel Fred's attendance at trial. The court denied the motion for a continuance but granted Christopher's request for the issuance of the certificate.

¶ 7    On October 23, 2006, the circuit court heard argument on Christopher's motion *in limine* seeking the admission of Fred's hearsay confession. The circuit court ultimately denied the motion because the confession did not fall within the hearsay exception for statements against penal interest. Christopher renewed his request for a continuance to secure Fred's attendance. The court denied the request, ruling that Christopher had not been diligent in attempting to procure Fred's attendance.

¶ 8    At trial, Morris Williams testified on June 23, 2003, he, Christopher, Fred, and friends Anthony Lorenzi and Carmello Cabrera, were all riding in a van when they passed up "Mex," the chief of the Maniac Latin Disciples (MLD) gang. Christopher told Mex to "get a new jersey," and Mex replied, "fuck you." When the group arrived at Christopher and Fred's apartment on the 1600 block of North Maplewood Avenue, they exited the van and Christopher argued with Mex, and two other MLD members named "Axel" and "P.T." After the argument, Chistopher left to get liquor with his girlfriend Eliana Lorenzi and Morris. Anthony and Carmello went up to the second-floor apartment. Christopher and Fred's sister Nicole McAtee and her friend "J-Lo" were up there. Fred remained outside. When gunshots were fired through the front of the home, Fred ran inside screaming that Axel was shooting.

¶ 9    When Christopher returned, Fred explained what happened. Morris, Christopher, Fred, and Carmello went outside and stood in the gangway. Fred used part of a gun to break out the lights on the side of the house so no one could see them. Christopher and Morris went over to a group of people sitting in Maplewood Park and asked which gang they belonged to. One of the girls told them that her child's father was a "Motor D," which Morris knew to be a type of Disciple gang. Morris and Christopher then left in a car driven by Eliana to look for Axel. Christopher was armed with a .357 revolver, the same gun Fred used to break the lights.

¶ 10    Although Morris knew where Axel lived, he did not say anything when they drove past Axel's house. They then drove to P.T.'s house. When they got to P.T.'s block, Eliana dropped Morris and Christopher off so they could walk to where P.T. was staying. Morris encouraged Christopher to "forget about it, it ain't worth it" and they eventually returned to Christopher's apartment.

¶ 11    Once they were back at the apartment, Christopher gave Morris his hooded sweatshirt and the gun and told him to go across the street to the park and shoot the guy in the face. Morris put the sweatshirt on and went downstairs with Christopher, Fred, and Carmello. As they were standing on the porch of the building, Morris saw P.T. coming "out with a gun" on the other side of Maplewood with two guys behind him. Fred repeatedly told Morris to shoot, but Morris just raised and lowered the gun because he did not intend to fire the weapon. P.T. and his friends left in a car.

¶ 12    Christopher was angry and took the gun from Morris, telling Morris to "whoop his ass" and to "move on him." Carmello had a bat and walked behind Morris as they headed across the street to the park. When Carmello chased the guy with a bat, one of the females ran after Carmello and the other female got into the passenger side of a car that was parked nearby. The car headed northbound on Maplewood. Morris went back across the street towards the house. While he was walking across the street, Christopher grabbed Morris by the shirt, leaned up against him, lifted his arm and began firing the .357 at the car. Christopher fired the gun four or five times. Morris heard a window break, and the car crashed into a pole.

¶ 13    Before Christopher went back to the upstairs apartment, he told Fred to hide the gun. Morris and Fred entered the building and went to a vacant apartment on the first floor. Once inside, Morris put the gun in a vent in the floor. Fred left the apartment, but Morris stayed and hid in a closet.

4

Morris testified that he fell asleep in the closet and was awakened later by police officers who handcuffed him and transported him to a police station.

¶ 14    Morris provided a handwritten statement and grand jury testimony that Christopher fired the weapon inches away from his face and after doing so, gave the gun to Fred with orders to hide it. At trial, Morris identified Christopher, as well as the gun used in the commission of the offense. At the time of the trial, Morris was incarcerated at Shawnee Correctional Center for aggravated robbery.

¶ 15    Anthony testified that on June 23, 2003, he was driving with Christopher, Fred, Morris, and Carmello to celebrate Christopher's birthday. They eventually went to Christopher's apartment.

¶ 16    Anthony and Fred were outside the apartment when two Disciple gang members, "Axel" and "Mex," Confronted them. Anthony testified that the Disciples had a problem with Fred because he was a former Disciple member. Christopher left to go to the liquor store with Eliana. Fred was outside the building arguing with a Disciple. A few minutes later, Fred ran into the upstairs apartment screaming, "get down." Anthony heard shots fired and Fred yelled, "they're shooting at us."

¶ 17    When Christopher returned to the apartment, he spoke with Fred and then left again with Eliana and Morris. They were gone for about 15 to 20 minutes and when they came back Christopher, Fred, Morris, and Carmello went to the front of the apartment building. Anthony, who stayed inside, heard arguing, looked out of the window, and saw some people across the street. He heard Fred screaming and then he heard the people from across the street. Anthony saw Fred throw a bottle and heard a car door slam before the car took off heading northbound on Maplewood. Soon after, Anthony heard three to four gunshots coming from the front of the house, so he ran to

the back of the house and told Eliana someone was shooting. Anthony and Eliana left the apartment through the back and went to her car. Christopher came from the alley and got in the car with them, and they left and drove to a hotel. The next morning, Christopher, Eliana, and Anthony returned to the apartment to pack boxes for a move that Anthony testified was planned prior to the shooting. At some point Anthony took Christopher's dog for a walk and when he returned, Nicole told him that the police arrested Christopher and Eliana. Anthony resumed packing boxes into a storage truck, but the police arrived and took him to Area 5 police headquarters.

¶ 18     Anthony met with Detective Arthur Young at about 4 p.m. on June 24, 2003. Anthony told the detective that he saw Christopher fire the gun and that he saw Morris and Fred near Christopher, but they did not have a gun. Anthony also provided a handwritten statement to an assistant state's attorney stating, "Anthony was focused on the car when he heard the first shot. Anthony looked and saw Pete [Christopher] holding a gun fire a second shot. Neither Juju [Fred] nor Moe [Morris] had a gun at that time. Pete [Christopher] was the only person Anthony could see shooting."

¶ 19     Anthony testified before the grand jury on June 25, 2003, that he saw Christopher fire the gun and did not see Morris or Fred with the weapon. Although Anthony acknowledged that he was able to meet with his parents prior to providing his handwritten statement and that Young and the assistant state's attorney did not tell him what to say, he indicated on cross-examination that he only gave his statement because he feared the officers and wanted to go home. Anthony stated, "I was told that [Christopher] confessed to it. I was told that everybody pointed the finger at him. I figured I wasn't doing him no harm. I was sixteen years old. I just wanted to go home." Anthony testified that his grand jury testimony was not true, but he provided it because he felt that he had to give the same testimony as his statement.

¶ 20     Carmen Figueroa testified that on June 23, 2003, the decedent was her best friend and lived

in Nashville, Tennessee. Racquel came to Chicago on June 21, 2003, with another friend from Nashville, Millita Gonzalez, to attend the Puerto Rican Festival. Racquel, Millita, Carmen, and another young woman named Cindy, drove to Maplewood Park where they met Carmen's uncle, Lee Ortiz. While at the park, Carmen saw Christopher across the street wearing a gray hooded sweatshirt and arguing with someone in a minivan. After the van left, Christopher and another young man approached her and asked about their gang affiliation. Cindy argued with Christopher, who raised his arm, pointed a large silver gun at Cindy, and said, "shut up bitch." When Carmen responded that they were not affiliated with any gangs, Christopher left and went into a house across the street from the park.

¶ 21    Christopher came back out of the house fifteen to twenty minutes later with three other people. They appeared angry with the people in the minivan and the minivan left. Raquel and Millita got in the car and Carmen told them to leave. Carmen saw an African American man and a Puerto Rican man holding a bat approach them from across the street. Christopher was speaking to the man who had the bat and Carmen told the man not to let them tell him what to do and tried to calm him down so he would not swing the bat at them. Christopher told the man, "just do what you got to do [,] [j]ust take care of those bitches." Christopher directed the two men to "get them," so Carmen's uncle ran and the one with the bat chased after him. Carmen followed behind as the man with the bat chased her uncle. While she was running, Carmen turned to see where everyone was going and observed Christopher shoot her friend. Carmen testified that she continued to run until she came across police officers.

¶ 22    On the evening of June 24, 2003, Carmen went to police headquarters and viewed a line-up. She identified Christopher and another individual who was with Christopher that night. The following day Carmen identified the African American man who approached her in the park.

¶ 23 On cross-examination, Carmen acknowledged that she provided a handwritten statement to a detective and an assistant state's attorney. Carmen's statement did not indicate that Christopher told Carmello or Morris to "just do what you have to do, take care of these [bitches]," or that Christopher told Cindy, "shut up bitch." Carmen also testified that when Christopher asked her and her friends "what they be about," she told the police and assistant state's attorney that she replied telling Christopher that her child's father was "Little Motor," a Maniac Disciple. She said it because she was scared and thought they would leave them alone. At trial, Carmen identified Christopher in the courtroom, as well as from a photograph of the line-up she viewed on June 24, 2003.

¶ 24 Cindy testified that she was with Carmen and Racquel at Maplewood Park on June 23, 2003. They were drinking and socializing when two boys came up to them and asked Carmen's uncle what gang he was with. Carmen's uncle said that he "wasn't nothing." Carmen told the boys that her child's father was a gang banger and that "he was okay." Cindy described the men as African American and Puerto Rican. The African American man had a gray hooded sweatshirt partially covering his face.

¶ 25 Cindy saw Christopher in the gangway right before the shooting. Cindy did not see a gun on the African American or the Puerto Rican male who came up to them. Cindy testified that Carmen's uncle was actually a gang banger and the two guys who approached them were arguing because Carmen's uncle was saying he was not in a gang. Cindy knew the two males who approached her from the neighborhood, but she did not know the two males in the gangway. Cindy was threatened with a gun by one of the two males in the gangway that she did not know. The African American and Puerto Rican males had a bat and confronted Carmen's uncle who supposedly was in a gang. Christopher and the other male were in the gangway and one of them

had a gun. Carmen's uncle ran, then Carmen ran after her uncle, and Cindy ran after Carmen. This was before she heard gunshots. Cindy saw Carmen's friend run towards her car and get in the driver's side door.

¶ 26    Cindy and Carmen ran into police officers, flagged them down, and went back to the scene. They saw the girl in the driver's seat of the car that had crashed into a pole. Cindy told the officers that she saw one of the males in the gangway with a gun. Cindy later went to the police station, where she viewed a line-up and identified two individuals. She also viewed photographs and identified all four of the individuals from the photos including the African American male, the Puerto Rican male who approached the male, and the two males in the gangway.

¶ 27    Young testified that he was assigned to investigate the shooting of Raquel. At the scene, he learned that Fred and Carmello were taken into custody. Cindy, Carmen, and Millita were present at the scene and Young observed a vehicle that had crashed into a light pole near the 1700 block of North Maplewood. Young also observed five rifle cartridge cases in the street, a black knit winter type skull cap in the parkway, and two aluminum baseball bats.

¶ 28    Around 2:30 a.m., Young spoke with a neighbor who unlocked the front door of the first-floor apartment in Fred and Christopher's building. The apartment was vacant but after searching it, Young discovered Morris in a bedroom closet and a chrome revolver in an air duct with six fired cartridge cases inside.

¶ 29    During the early morning hours of June 24, 2003, Young interviewed Cindy, Millita, Carmen, Carmello, Fred, and Morris. After interviewing these individuals, Young looked for Christopher and ultimately found him and Eliana in the second-floor apartment at Christopher's apartment building. A gunshot residue test was not performed on Christopher because it had been 12 hours since the shooting and was beyond the six-hour window of time for which it would be

appropriate.

¶ 30    Young interviewed Christopher around 1:20 p.m. Later, Young learned that Anthony was moving objects at the apartment building and asked officers to bring Anthony to the station. Young also conducted another interview with Morris before interviewing Anthony. Young testified that he never told Anthony that Christopher had already confessed to the crime or that other witnesses had identified Christopher as the shooter.

¶ 31    Chicago Police Sergeant Daniel Jacobs testified that he assisted in the investigation of Raquel's murder on June 24, 2003, by transporting witnesses to Area 5 police headquarters. He then went to Christopher's residence and placed him in custody.

¶ 32    Jacobs testified that he was present when Cindy, Millita, and Carmen viewed a line-up that included Christopher and Fred. Carmen and Cindy identified Fred and Christopher as two of the males involved in the shooting. Carmen identified Christopher as the one who pointed the gun at Cindy. Cindy did not know which one threatened her with the gun. Millita was unable to identify anyone from the line-up. Later, Cindy, Millita, and Carmen viewed another line-up that included Morris. Carmen and Cindy identified Morris as one of the males that approached them, asked their gang affiliation, and chased away Carmen's uncle. However, Millita was again unable to identify anyone from the line-up because she was in the car with the victim. Carmen and Cindy gave handwritten statements. A short time later, Fred, Anthony, and Eliana gave handwritten statements, and Christopher was charged with murder.

¶ 33    Cook County Assistant Medical Examiner Dr. Andrea Segovia testified that she performed an autopsy on the victim on June 25, 2003. The external examination of the victim "revealed a gunshot wound of entrance on the right side of the head." Dr. Segovia concluded that the gunshot wound caused the victim's death and the manner of death was homicide.

¶ 34    Aimee Stevens was qualified as an expert in firearms identification. She testified that she received the Smith and Wesson, Model 66557 Magnum caliber revolver and six fired cartridge cases from this case. There were not sufficient individual characteristics on the cartridge cases to determine whether they were fired from the revolver. Stevens received another five fired cartridge casings that could not have been fired from the revolver. Stevens also received a bullet fragment which could not be identified or eliminated as having been fired from the revolver.

¶ 35    Forensic Scientist Jennifer Barrett testified that she received the recovered revolver and six discharged cartridge cases to test for latent prints. Barrett did not find any latent impressions suitable for comparison. Forensic Scientist Mary Wong identified gunshot residue kits for Fred, Carmello, and Morris, which she received on September 24, 2003. She testified that the test results of the kits associated with Carmello and Fred could be characterized as negative, meaning that they may not have discharged a firearm. Wong testified that based on the gunshot residue test, Morris may have discharged a firearm or come into contact with primer gunshot residue. Wong opined that the results of the test were inconclusive.

¶ 36    The State rested, and Christopher moved for a directed verdict, which the circuit court denied. The court also admonished Christopher of his right to testify and asked if he had an opportunity to discuss with his attorneys the evidence that was going to be presented on his behalf. Christopher responded that he understood that evidence would be presented on his behalf and that he agreed with the evidence.

¶ 37    The defense then presented a stipulation that assistant state's attorney David Weiner took a five-page statement from Carmen on June 25, 2003. The statement did not indicate that Carmen told ASA Weiner that she saw Christopher fire a gun, or that Carmen even saw a gun at all that night. The defense rested.

¶ 38    The jury found Christopher guilty of first-degree murder. He was sentenced to an aggregate term of 70 years in prison.

¶ 39    Christopher appealed and argued that the circuit court erred in denying: (1) his pre-trial request for a continuance to procure Fred's presence in court; and (2) his motion *in limine* to admit a statement Fred gave to defense counsel in December 2003, as a statement against penal interest. This court affirmed, finding no abuse of discretion by the court in denying Christopher's motion for a continuance where, *inter alia*, counsel failed to exercise reasonable diligence in subpoenaing Fred prior to trial and failed to show that there was a reasonable expectation of procuring his attendance at trial. This court further found no abuse of discretion in denying Christopher's motion *in limine* to admit Fred's hearsay confession because the statement lacked sufficient indicia of trustworthiness under *Chambers v. Mississippi*, 410 U.S. 284 (1973). *People v. McAtee*, No. 1-07-1921 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 40    On August 31, 2010, Christopher filed an 88-page *pro se* postconviction petition wherein he alleged, in pertinent part, (1) actual innocence; and (2) ineffective assistance of counsel based on counsel's conduct in entering into a stipulation regarding DNA evidence. In support of his actual innocence claim, Christopher relied on affidavits from Fred and Nicole. Christopher also maintained that Anthony gave a detailed account of what led up to the shooting in his affidavit. However, the affidavit was not attached to the petition.

¶ 41    In his affidavit which was attached to Christopher's petition, Fred averred that he murdered Raquel, that his handwritten statement and grand jury testimony implicating his brother were untrue, and that he would have testified accordingly had he been called as a witness at trial. In her affidavit, also attached to Christopher's petition, Nicole averred that she witnessed Fred shoot at the victim's car and that, two months after the incident, she informed defense counsel of her

observations, but was told not to worry about it. She further averred that defense counsel did not call her as a witness at trial, despite knowing that she was willing to testify to what she had witnessed.

¶ 42 The circuit court dismissed Christopher's petition as frivolous and patently without merit, finding that the substance of the affidavits was not newly discovered evidence because the affiant's testimony was available at the time of trial. Thus, Christopher had no basis upon which to claim actual innocence. The court found that Christopher's claim of ineffective assistance of counsel had no arguable basis in law in that he had failed to show that it was objectively unreasonable for counsel to enter into the DNA stipulations, and that the stipulations prejudiced the defense, as was required by *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

¶ 43 Christopher appealed, arguing that the circuit court erred because he stated the gist of a constitutional claim. On appeal, Christopher abandoned the claims he raised before the circuit court–actual innocence and ineffective assistance of counsel–and raised a new claim of ineffective assistance of trial counsel based on counsel's failure to contact, subpoena and call Fred and Nicole as witnesses. *People v. McAtee*, 2012 IL App (1st) 103646-U, ¶ 11 (J. Garcia, specially concurring; J. Gordon, concurring in part and dissenting in part).

¶ 44 This court issued a highly fractured decision. The authoring justice held that the only claim sufficiently pled was an ineffective assistance of counsel claim relating to counsel's failure to call Nicole, and any ineffectiveness claim relating to failure to procure Fred's testimony was waived for failure to raise it on direct appeal. The concurring justice, however, held that such specificity in the court's ruling was unnecessary because petitioners are permitted to amend and add claims during second-stage proceedings, so the petition could still raise properly plead claims relating to ineffective assistance and Fred's affidavit. The dissenting justice agreed with the remedy of

remanding for second-stage proceedings, but like the concurring justice, determined that both Fred and Nicole's affidavits, along with any other new evidence presented upon amendment of the petition *via* counsel, are available for consideration during further proceedings post-remand. *Id*. ¶¶ 17-20. Accordingly, this court reversed the summary dismissal and remanded for second stage proceedings. *Id*.

¶ 45    Following remand, Christopher, now represented by counsel, filed an amended petition for postconviction relief. In that petition, Christopher realleged all the contents of his *pro se* petition and again claimed actual innocence based on the affidavits of Fred, Nicole, Willie McGee, Maria Dieppa, Maria Sanchez and Eva Galambos. Christopher also argued that he received ineffective assistance of trial counsel because counsel failed to: (1) investigate and uncover the five witnesses whose affidavits supported his claims of actual innocence; (2) find witnesses to support Fred's assertion that he was the shooter; and (3) locate and call Fred as a witness. Christopher also argued that he received ineffective assistance of appellate counsel based on counsel's failure to raise any issues that could have been raised on direct appeal or on the appeal from the denial of his *pro se* postconviction petition. Finally, Christopher argued that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by (1) the State withholding evidence that Fred's statement to the police was given after an agreement that he would not be arrested, (2) the police withholding evidence that Galambos identified Fred as the shooter, and (3) cumulative error.

¶ 46    The State moved to dismiss Christopher's amended postconviction petition. Christopher responded and supplemented the petition by including an amended affidavit from Nicole. The State responded with an amended motion to dismiss.

¶ 47    At the hearing on the motions, the circuit court dismissed the claims of ineffective assistance for failure to locate and call witnesses and ineffective assistance of appellate counsel

and rejected Christopher's attempt to revisit the issue of Fred's confession being admitted as an exception to the hearsay rule, finding it "moot." The court also dismissed Christopher's claim of actual innocence based on the court reported copy of Fred's taped confession that was attached as an exhibit to Fred's affidavit at the second stage. The court found the confession was not newly discovered evidence because it was available at the time of trial. The court distinguished between Fred's affidavit and his confession and observed that "the confession of [Fred] is not newly discovered evidence. However, portions of his affidavit could be considered newly discovered[.]" The court allowed Christopher's actual innocence claim based on Fred's affidavit to proceed to a third stage evidentiary hearing provided that Fred appeared in court to testify at the hearing.

¶ 48    The circuit court allowed several other claims to advance to a third stage evidentiary hearing: actual innocence based on the affidavits for McGee, Dieppa, Sanchez, Galambos, and Nicole; a *Brady* violation based on Galambos's affidavit that her statement to police was allegedly reduced to written form; and a *Brady* violation in that police allegedly made an agreement with Fred that he would not be arrested if he made a statement. The State answered the petition with respect to the foregoing claims.

¶ 49    Because the question of whether Nicole told her story to defense counsel before trial and was still not called to testify involved a credibility determination, the circuit court ordered a separate hearing before the claim could advance to the third stage. The court wanted to hear testimony from Nicole to determine the ineffective assistance of counsel claim before it would be advanced for purposes of actual innocence.

¶ 50    On May 8, 2019, Christopher moved to certify Fred, who was living in Wisconsin, as a material witness at the evidentiary hearing. The court granted the motion.

¶ 51    The separate hearing began on August 22, 2019. At the hearing, Nicole, now known as

Nicole Menore, testified that she is the younger sister of Christopher and Fred. She attended all the court dates on Christopher's case prior to trial, had been in contact with Christopher, and had conversations with him about the possibility that she could be a witness at his trial. Although Nicole attended the trial, she only said "hi" to Christopher's attorney "Ralph" except for one court date in which Ralph introduced her to two men who were working on the case with him. Nicole did not have any conversations with Ralph or the other trial attorneys until the last day of trial, after Christopher had already been found guilty. According to Nicole, she was willing to come to court and testify but really did not want to testify because she was scared of Fred.

¶ 52    After Christopher was convicted, Nicole and Ralph had a conversation in the courtroom gallery. Nicole told Ralph that she was present during the incident and if she could help in any way, including making a statement, he should let her know. Nicole did not tell Ralph or any other attorneys that she saw the shooting. The first time Nicole told anyone that she saw the shooting was in 2010 when she signed an affidavit.

¶ 53    After hearing Nicole's testimony, the circuit court determined that there was "no credible evidence whatsoever from Nicole that she ever spoke to the attorneys prior to trial." The court went on to say that "even if the attorneys had known what she was going to testify, which is what we heard here in court, it would clearly have been a strategic decision in this Court's opinion not to call her as a witness because her credibility is so poor, it would have hurt the defense or at least would not have aided it in any way." Therefore, the court found that her affidavit did not support an ineffective assistance of trial counsel claim. The court also considered her testimony for purposes of a third stage actual innocence claim and determined that it was not newly discovered and was not of such conclusive character that it would probably change the result on retrial because her testimony was "so inconsistent and so incredible."

¶ 54    At the following third stage evidentiary hearing, Christopher called Fred as a witness. After acknowledging that Christopher is his brother, Fred exercised his rights under the fifth amendment of the United States Constitution a dozen times with regard to all further questions, including whether he killed Raquel. The circuit court asked Fred if he intended to invoke his fifth amendment rights with regard to all questions involving June 23, 2003, and Fred responded that he did. The court then excused Fred, determining that it did not have a good faith basis that Fred would answer any additional questions.

¶ 55    After presenting Fred's testimony, post-conviction counsel filed a motion to supplement the amended petition with an affidavit from Sheena Ojibaway, Fred's girlfriend, who allegedly provided additional evidence in support of Christopher's actual innocence and ineffective assistance of counsel claims. Post-conviction counsel also asked to call Ojibaway as a witness. In her affidavit, Ojibaway averred that Fred confessed to her that he fled Chicago because he shot at a car by his house in Chicago, hitting the woman and causing her death. The court denied the motion to supplement, determining that the issue raised therein was waived because it could have been brought on appeal.

¶ 56    McGee testified at the hearing that he was in custody for first-degree murder and was arrested for it in 2005. He and Christopher know each other and were friends in 2003. McGee saw Christopher in the kitchen at Statesville Correctional Center in 2017 and learned that he was incarcerated for a murder that happened on Christopher's birthday on June 23, 2003. McGee asked Christopher, "how was you in here for something that happened right then and there when you wasn't out there." McGee stated that on June 23, 2003, he was supposed to produce music with Christopher, but they didn't because there was a shooting. McGee was four or five houses down the street from Christopher's house visiting a girl named "Flaca" when he heard the first shots at

5 or 6 p.m. Later, between 10:00 and 11:15, he saw Christopher go back to his house, go inside and leave again with his girlfriend. After Christopher and his girlfriend left, a little kid, a black guy named "Murk" and a Latino named "JuJo" came out of Christopher's house. The three argued with someone across the street and the little kid chased someone in the park with a bat. Shortly after that, JuJo fired shots.

¶ 57    Without being asked by Christopher, McGee wrote an affidavit because he knew it would be helpful. McGee provided two affidavits in total. He handed Christopher the first affidavit, which was done on May 25, 2017, when Christopher came through the chow line. The second affidavit was completed after one of Christopher's attorneys came to visit him on November 9, 2017. The second affidavit includes the name of the person who did the shooting. Initially, McGee didn't want to get mixed up in testifying but he decided to tell the whole story.

¶ 58    Alex Gualino was qualified as an expert in the field of translating between English to Spanish and Spanish to English. Gualino did not prepare the Spanish or English affidavits of Sanchez and Dieppa, but the English versions of the Spanish affidavits are a fair and accurate translation.

¶ 59    Sanchez testified via Spanish to English translator. She remembered the day of June 23, 2003, well, although it was 18 years ago. On that day, she and her friend Letisia Diaz went to a house on the 1600 block of North Maplewood Avenue at 10 p.m. She knew it was 10:00 p.m. because she looked at her watch. She was there for one to two hours. Sanchez was seated inside the car and Diaz was standing outside of the car. They were talking to Norma on the opposite side of the street from Christopher's building. Sanchez testified that she was about 200-300 feet away and there were cars and trees blocking her line of sight.

¶ 60    According to Sanchez, two males came out of the house and a woman came after them.

One of the males was not wearing a shirt and had a gun. He was arguing with and pointing the gun at the other young male. Sanchez had never seen these people before, but Norma told her that day that "Pete" lived at that house, and it was "Pete" who came out of the house. Sanchez identified Christopher as "Pete." Sanchez said that she never saw Christopher with a gun but did see a man with a bandana covering his face fire a gun over someone's shoulder towards the car that fled. Sanchez said she was about to hide but managed to look back and saw a woman grab Pete and take him back inside before the person fired the gun at the car. She couldn't see the person who fired the gun. She was scared and did not call the police.

¶ 61    The next time Sanchez was in the area of North Maplewood was 10 years later in 2013. She saw a flyer posted asking anyone who had knowledge about the shooting to call a phone number. Sanchez testified that there was no name associated with the phone number, but when she called, a man answered and asked Sanchez if she knew something about the shooting. Sanchez said yes and asked the man to give her an address where she could send a statement. Between 2003 and 2013, Sanchez did not tell anyone about what she saw. Sanchez signed the affidavit on April 14, 2013, in Joliet.

¶ 62    Dieppa also testified via Spanish to English translator. She stated that 18 years ago on June 23, 2003, she was heading home between 10:00 and 10:30 p.m. She stopped in Maplewood Park because it looked nice, and she wanted to sit there for a while before going home. Dieppa stated that it wasn't dark because there was a summer moon and street lighting.

¶ 63    As she sat on a bench, she saw two or three young men come out of the house on the 1600 block of North Maplewood Avenue. They were arguing in English with some guys that were in the park. She was sitting about 40-50 feet away from the house. One of the young men had a gun and pointed it at the men in the park but did not fire. Dieppa testified that a person she recognized

19

as "Pete" came out of the house and grabbed the arm of the man with the gun. She only knew his name was Pete because she once passed by the park and twice heard a neighbor call him by that name. Dieppa did not know Pete personally, had never spoken to him, and is not friends with anyone in his family. Dieppa also testified that a woman pulled the man with the gun back inside the house. Dieppa remained on the park bench and did not move. About a half hour later, the same guys from the park came back and began firing towards the house. At least two of the guys in the group were firing at the house. She was scared but decided it was better to stay.

¶ 64    The guy from the house who had the gun earlier came out again and started arguing with the guys who fired at the house. Pete was not there. The guys from the park with guns ran towards their car and sped away Northbound towards Wabansia Avenue. The guy with the gun started shooting at the car and it crashed into a post. The guy with the gun was wearing a blue, red and white bandana covering his forehead. Dieppa did not tell anyone about what she saw except her boyfriend at the time.

¶ 65    Dieppa saw a flyer posted on a light pole on Maplewood asking if anybody witnessed "the incident" to call a phone number so she called the number. The flyer described the event as "the incident" but did not contain a date of the incident. When Dieppa called the number, she spoke to Pete's mom, Carmen, and told her that she witnessed everything. Carmen asked Dieppa if she could help her by giving a statement. Dieppa agreed. A few days later they met on the corner of Maplewood and North Avenues and talked about what happened that night. A few days after that, they went to have her statement notarized. She spoke to the notary in Spanish and the notary wrote it in English. Dieppa cannot read English, but she signed it afterwards and told Carmen that she also wanted it in Spanish. On February 23, 2013, they went to another notary and that notary took her statement down in Spanish.

¶ 66    Dieppa identified Christopher in court and testified that he is not the person who fired at the car. Christopher did not have a gun. Dieppa stated that she remembers clearly that Christopher was not there when the guy started firing towards the car where the young men were.

¶ 67    Christopher's exhibits were admitted, and he then rested his case in chief. The State made a motion for directed finding. The circuit court granted the State's motion and dismissed the amended postconviction petition. This appeal is taken from the dismissal of Christopher's second stage and third stage claims following an evidentiary hearing.

¶ 68                                    II. JURISDICTION

¶ 69    The circuit court dismissed Christopher's claims at the second- and third-stage postconviction proceedings on May 19, 2022. He appealed on June 7, 2022. This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art VI, § 6), and Illinois Supreme Court Rule 651 (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 70                                    III. ANALYSIS

¶ 71    The Illinois Postconviction Hearing Act (Act) provides a three-stage process for adjudicating petitions alleging that a conviction resulted from a constitutional violation. 725 ILCS 5/122-1 *et seq*. (West 2016); *People v. Hodges*, 234 Ill. 2d 1, 10 (2009). At the first stage, the circuit court reviews the petition and may summarily dismiss it if the court determines it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2010); *People v. Perkins,* 229 Ill. 2d 34, 42 (2007). At the second stage, counsel is appointed, and the State may move to dismiss the petition. See *People v. Domagala*, 2013 IL 113688, ¶ 35. At the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *Id*. All well-pleaded facts not positively rebutted by the trial record are taken as true. *Id*. If a substantial

showing of a constitutional violation is made, the petition advances to the third stage for an evidentiary hearing; if not, the petition is dismissed. *Id*. At the third stage, the court hears evidence and determines whether, based on that evidence, the petitioner is entitled to relief. *People v. Garcia*, 2015 IL App (1st) 131180, ¶¶ 46-47.

¶ 72                                    A. Second Stage Claims

¶ 73    Christopher first argues that the circuit court erred in dismissing his claims of ineffective assistance of trial and appellate counsel at the second stage, where he made a substantial showing of constitutionally deficient representation. Christopher argues that trial counsel was ineffective because he failed to locate, investigate, and present exculpatory evidence, namely that Fred was the shooter in this case. He claims that despite knowing that Fred confessed to the murder and possessing an audio recording of his confession made three years prior to trial, trial counsel did not pursue this compelling defense until days before trial, when it was too late. Christopher also faults trial counsel for failing to investigate or call Fred's girlfriend, Sheena Ojibaway. According to Christopher, Fred confessed to Ojibaway, and calling her would have corroborated Fred's confession. Finally, Christopher argues that trial counsel was ineffective for failing to interview Nicole prior to trial. Christopher alleges that appellate counsel should have raised these issues regarding trial counsel's ineffectiveness on direct appeal.

¶ 74    At the second stage, "[t]he inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations." *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. *Id.* In addition, at the second stage, the circuit court examines a postconviction petition to determine its legal sufficiency and any allegations not affirmatively

22

refuted by the record must be taken as true. *Domagala*, 2013 IL 113688, ¶ 35. Thus, the substantial showing of a constitutional violation that must be made at the second stage is "a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, which if proven at an evidentiary hearing, would entitle petitioner to relief." (Emphasis omitted.) *Id.* Where the circuit court dismisses portions of a defendant's postconviction petition at the second stage after finding no substantial showing of a constitutional deprivation has been made, review of the dismissal is *de novo*. *People v. Cotto*, 2016 IL 119006, ¶ 24. We may affirm the dismissal based on any reason supported by the record because we review the judgment, not the court's reasoning. *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010).

¶ 75    When faced with challenges to trial counsel's ineffectiveness, we generally apply the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted in Illinois in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on a claim of ineffective assistance of counsel under *Strickland*, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions prejudiced the defendant. *Strickland*, 466 U.S. at 687; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id.* Failure to satisfy either prong of the *Strickland* test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 76    Claims of ineffective assistance of appellate counsel are governed by the same test used in assessing claims of ineffective assistance of trial counsel set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Lacy*, 407 Ill. App. 3d 442, 457 (2011). A petitioner challenging appellate counsel's effectiveness must show both that appellate counsel's performance was

deficient and that, but for counsel's errors, there is a reasonable probability the appeal would have been successful. *Id.* Appellate counsel need not brief every conceivable issue on appeal and may refrain from developing non-meritorious issues without violating *Strickland*. *People v. Guerrero*, 2018 IL App (2d) 160920, ¶ 43. Therefore, unless the underlying issue is meritorious, a petitioner suffers no prejudice if counsel does not raise it on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Thus, in this case, in order to assess the merit of Christopher's ineffective assistance of appellate counsel argument, we must determine whether he received ineffective assistance of trial counsel.

¶ 77          1. Ineffective assistance of trial counsel for failing to call Fred to testify

¶ 78    Christopher alleges that he made a substantial showing of ineffective assistance when trial counsel failed to locate Fred, interview him, and secure his attendance at trial. He argues that despite Fred's confession, the jury never heard that Fred was the shooter. Christopher further contends the record shows that trial counsel did not make any effort to subpoena Fred until days before trial, despite having the recorded confession for three years. We note that the circuit court determined that this issue was "moot" and made no determination as to whether Christopher made a substantial showing of a constitutional violation.

¶ 79    The State argues that trial counsel's decision not to pursue Fred testimony was a matter of trial strategy. The State claims that because Fred provided a handwritten statement and grand jury testimony within 48 hours of the murder that contained information contrary to what he told Christopher's attorney on December 17, 2003, Fred's potential trial testimony implicating himself could have been impeached with his prior statements to police and assistant state's attorneys and then his grand jury testimony would have been admissible as substantive evidence. The State

further claims that the potential statements used to impeach Fred's testimony would then corroborate Morris' and Carmen's trial testimony and bolster the State's case.

¶ 80    On December 17, 2003, almost three years before Christopher was convicted, Fred provided Christopher's defense counsel with a recorded confession. In the confession, Fred stated that he and his friends were driving around in his father's van drinking champagne and celebrating Christopher's birthday. When they got dropped off at home, there were three or four gang members outside with whom Fred had prior altercations. The gang members called Christopher "bitches and stuff like that." Fred then went upstairs and grabbed his gun, a 357 magnum, and a bulletproof vest, then stood in the doorway. When Christopher got in his car and left, they "called him a bitch when he drove off," so Fred confronted them and got into a shouting match with the other gang members.

¶ 81    After a heated verbal exchange, Fred stood guard on the porch of his apartment building. A rival gang member he knew as Axel returned with a rifle and shot at the house. Fred closed the door and ran upstairs and told everyone to "get down because somebody is shooting at the house." Christopher returned home with his girlfriend about a half hour later, and Fred told them about the shooting. Fred told Christopher to leave because he "didn't want him to be there" when something went down. Christopher and his girlfriend left again. Fred stayed on the porch shouting gang taunts back and forth with rival gang members down the block who were holding guns. When he looked across the street to the park, there was another gang member, who was not from the neighborhood, also shouting gang taunts. Fred sent Carmello and Morris across the street to the park with baseball bats to chase him away. Fred then saw a gang member, who was holding what Fred thought was a gun but turned out to be a bottle, get into the backseat of a car with some women. The man was "ducking" and Fred thought the man was "grabbing for a gun, reaching for a gun." Fred threw a

"Coca-Cola bottle" at the car as a warning. He waited for them to drive away and then fired "the whole six shots at them" because he was angry and because he believed the man was reaching for his gun. The car then swerved and crashed into a light pole. Immediately after the crash, the man in the car got out and ran. During the shooting, Fred had been wearing a hooded sweatshirt and a Puerto Rican flag bandana covering his face.

¶ 82    Fred gave Morris the gun and told him to hide it. Morris hid the gun in the ventilation duct in the first-floor apartment. Fred and Carmello then ran upstairs and removed their clothes and put them in the dirty laundry. He could see that officers were outside investigating the crime scene. About 15 or 20 minutes after the shooting and after the police had already arrived, Fred saw Christopher arrive back home in his girlfriend's rental car through the front window. However, the car just pulled up and then sped off. The police came into the building and took Fred and Carmello to the police station. Fred acknowledged that he gave a statement to the police implicating Christopher because he was scared and "everything happened so fast" but the statement was not correct. Fred also stated that he testified before the grand jury and "told them my brother had did it. But I was just scared." Fred stated, "I did everything." Fred also admitted that he had confessed to his girlfriend in August 2003, and she knew about his commission of this crime.

¶ 83    Generally, "the choice of defense theory is ordinarily a matter of trial strategy, and counsel has the ultimate authority to decide this trial strategy. *People v. Guest*, 166 Ill. 2d 381, 394 (1995). This court will generally not review a claim of ineffectiveness of counsel based on inadequate trial strategy." *Id.* The fact that another attorney might have pursued a different strategy or that the strategy chosen by counsel ultimately proved unsuccessful, does not demonstrate incompetence or suggest ineffective representation. *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). However,

26

"[a]ttorneys have an obligation to explore all readily available sources of evidence that might benefit their clients." *People v. Morris*, 335 Ill. App. 3d at 79.

¶ 84    A defendant can overcome the strong presumption that defense counsel's choice of strategy was sound if counsel's decision appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy. *People v. Faulkner*, 292 Ill. App. 3d 391, 394 (1997). Furthermore, counsel's tactical decisions may be deemed ineffective when they result in counsel's failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense. *People v. Gibson*, 244 Ill. App. 3d 700, 703-04 (1993); *People v. Truly*, 230 Ill. App. 3d 948, 953 (1992); *People v. Skinner*, 220 Ill. App. 3d 479, 485 (1991); *People v. O'Banner*, 215 Ill. App. 3d 778, 790 (1991).

¶ 85    We find the trial counsel's decision not to pursue Fred as a witness cannot be viewed as a strategic decision.   Christopher's counsel was aware that Fred's testimony could potentially exonerate him. Accordingly, counsel informed the court that he wanted to call Fred as a witness at trial and attempted to obtain a continuance to secure Fred's presence. When the court denied this request, counsel then attempted to admit Fred's confession as an exception to the hearsay rule, which the court also denied. This was not a case, as the State claims, where defense counsel made a strategic decision not to call Fred. Although Fred may have been "a fugitive from Illinois with an outstanding warrant for unlawful use of a weapon and had continued to evade contact with Illinois law enforcement," (*McAtee*, No. 1-07-1921, p. 6), the record shows that counsel made no effort to find him prior to trial or secure his presence in court. Although counsel will not be deemed deficient when a witness has previously been subpoenaed unsuccessfully and would have to waive his fifth amendment privilege and implicate himself in order to exculpate defendant (*People v.*

*McCraven*, 97 Ill. App. 3d 1075, 1076 (1981)), the circumstances here show that counsel failed to exercise reasonable diligence in locating Fred. In our prior review of this case, we stated:

> "A review of the record indicates that defense counsel failed to exercise reasonable diligence in attempting to locate and subpoena Fred McAtee prior to trial. Defense counsel knew as early as December 17, 2003, that Fred McAtee was a potential exculpatory witness. Nevertheless, counsel admitted to the court that the first time he or anyone else from his office ever spoke with Fred McAtee was on October 19, 2006, four days before the jury was scheduled to be picked.

> Moreover, defense counsel never made any earlier attempts to subpoena Fred McAtee or ask the trial court to enter an order procuring his attendance, even though counsel was aware of the witness for almost three years.

> * * *

> Therefore, defendant's requests for continuances to secure the presence of Fred McAtee were properly denied * * * because defense counsel failed to exercise reasonable diligence in attempting to locate and subpoena this witness * * *." (Emphasis added) *People v. McAtee*, No. 1-07-1921 (unpublished order pursuant to Illinois Supreme Court Rule 23).

¶ 86 Counsel's performance may be constitutionally deficient when he or she fails to call a known witness whose testimony may exonerate the defendant. *People v. Brown*, 2017 IL App (3d) 140921, ¶ 32. Although Fred provided a handwritten statement and grand jury testimony that implicated Christopher, trial counsel was aware that Fred provided a recorded statement in 2003 that exonerated Christopher. The record also shows that counsel understood the value of this statement to the defense and wanted to call Fred as a witness, but inexplicably waited until four days before trial to attempt to secure his presence, claiming that the process to subpoena an out-

of-state witness was difficult and complicated. Although trial counsel indicated to the circuit court that he could not state definitively what Fred would have said if he were called to testify at trial, counsel knew or should have known, based on Fred's 2003 recorded statement, that the testimony may have been exonerating. *Brown*, 2017 IL App (3d) 140921, ¶ 32. We cannot conceive of any reasonable trial strategy that would explain counsel's failure to locate Fred in a timely manner, interview him, and compel him to appear at trial. Trial counsel had three years to attempt to accomplish this but did nothing. Where trial counsel attempted to offer evidence of Fred's confession, however belatedly, we cannot attribute his failure to do so here to trial strategy.

¶ 87    When defense counsel's performance is deemed deficient for failing to call known witnesses whose testimony may exonerate the defendant, prejudice can be established by presenting affidavits showing the testimony that those witnesses would have provided. Without such affidavits, there is no way of knowing whether that testimony would have affected the outcome of the proceedings. *Brown*, 2017 IL App (3d) 140921, ¶ 32.

¶ 88    Fred provided a notarized affidavit dated July 21, 2010, that is appended to Christopher's amended postconviction petition. In the affidavit, Fred states that he committed the murder of Raquel but that he initially lied and told the police and the grand jury that Christopher committed the murder because he was instructed to do so by the State's attorney and because "of fear of the police involved in this case." Fred stated that he was willing to testify to the facts contained in his affidavit and had counsel called him at trial, he would have confessed to committing the murder. Fred also incorporated a transcript of his full notarized confession given to defense attorneys in 2003.

¶ 89    In *People v. Tate*, 305 Ill. App. 3d 607 (1999), the petitioner was convicted of murder and attempt murder related to a shooting. In his postconviction petition, the petitioner alleged that trial

counsel's failure to call three alibi witnesses constituted ineffective assistance. The court dismissed the petition after second stage proceedings. *Id*. at 610. On appeal, we found that the petitioner made a substantial showing of a constitutional violation and should have been afforded an evidentiary hearing because the affidavits supported the petitioner's theory that he was misidentified as the shooter. *Id*. at 612. Further, the court stated, "[t]he record does not reflect whether counsel made a professionally reasonable tactical decision not to call witnesses or whether, as defendant maintains, counsel failed to call them as the result of incompetence." *Id*.

¶ 90 We find that the facts here are closely aligned with those in *Tate*. As such, we find that Christopher made a substantial showing that he received ineffective assistance of trial counsel for failing to investigate and call Fred as a witness. Christopher established that counsel's performance was deficient for not locating, interviewing and calling Fred, and had counsel done so, there is a reasonable probability that the result of the trial would have been different. Therefore, we also find that he has made a substantial showing that appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness on appeal. *Childress*, 191 Ill. 2d at 175 (when the underlying issue is meritorious, a petitioner suffers prejudice if counsel does not raise it on appeal). Thus, we remand to the circuit court for an evidentiary hearing on this issue.

¶ 91 In remanding for an evidentiary hearing, we are mindful that Fred asserted his fifth amendment right without answering any substantive questions when called to testify at the evidentiary hearing, and we have no way of knowing if Fred will assert his fifth amendment right at the new evidentiary hearing. However, speculation as to what Fred may or may not say at the hearing does not factor into our evaluation of this issue. We must evaluate trial counsel's performance from the perspective at the time of trial and not "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007) (citing *People v. Madej*, 177 Ill. 2d 116, 157 (1997)).

¶ 92        2. Ineffective assistance of trial counsel for failing to interview Ojibaway

¶ 93    Christopher also claims that trial counsel was deficient when he failed to investigate Ojibaway's claim that Fred had confessed to her that he was the shooter. In his 2003 confession to the defense team, Fred admitted that he had discussed his guilt for this crime with Ojibaway. She also provided a notarized affidavit. On October 18, 2019, Christopher filed a motion to amend his postconviction petition to add Ojibaway's affidavit, arguing that her affidavit supported his ineffective assistance of counsel claims. In the affidavit, Ojibaway averred that, in 2003, two lawyers came to her apartment to talk to Fred. She was not there at the time. Ojibaway stated that Fred told her that he moved to Eau Claire, Wisconsin, at the end of 2003 because "he started blasting (shooting) at this car by his house in Chicago and that female was shot in the head, the car ended up hitting a tree or post. The female died." She also said that as time went by, "[Fred] became cockier, that's when I heard him telling other people in Eau Claire bragging about, that he had killed some gang banger in Chicago and that he was on the run for it." Ojibaway averred that if she was called to testify, she would testify consistent with her affidavit.

¶ 94    We note that the State has conceded the circuit court improperly found that Christopher waived this issue by failing to raise it in his initial petition. We agree. At the second stage, counsel may amend the petition if necessary. *People v. Cotto*, 2016 IL 119006, ¶ 27. We therefore consider this claim.

¶ 95    We find that counsel's failure to locate and interview Ojibaway also amounted to deficient performance. Fred admitted in his confession that he had discussed his guilt for this crime with Ojibaway. Trial counsel was aware that Fred confessed to Ojibaway but failed to investigate or call her as a witness. Furthermore, in light of the exculpatory nature of Ojibaway's affidavit, in conjunction with Fred's confession and his subsequent affidavit, we can say there exists a

31

reasonable probability that the outcome of the trial would have been different had counsel located and interviewed Ojibaway. Therefore, we find that Christopher made a substantial showing that trial counsel was ineffective for failing to investigate Ojibaway. Hence, we find that Christopher made a substantial showing that appellate counsel was ineffective for failing to raise this claim on direct appeal. We remand to the circuit court for an evidentiary hearing on this issue.

¶ 96          3. Ineffective assistance of trial counsel for failing to interview Nicole

¶ 97     Christopher argues that counsel's assistance was ineffective when he failed to interview Nicole before trial. In her 2010 affidavit, Nicole averred that she was present during the shooting and that Fred, not Christopher, committed the crime. Nicole stated that after Christopher was charged with murder she talked to Christopher's lawyers and "told them what I seen but they told me don't worry about it, we got it under control."

¶ 98     Prior to advancing Christopher's ineffective assistance of trial counsel claim for failure to investigate and call Nicole and his claim of actual innocence to the third stage, the court ordered a separate hearing to determine Nicole's credibility. The court did so to rule on the ineffective assistance of counsel claim before it would consider Nicole's affidavit in support of Christopher's innocence claim.

¶ 99     At the hearing, Nicole testified that she had been in contact with her brother Christopher and had conversations with him about the possibility that she could be a witness at his trial. Although Nicole attended the trial, she only said "hi" to Christopher's attorney "Ralph" except for one court date in which Ralph introduced her to two men who were working on the case with him. Nicole did not have any conversations with Ralph or the other trial attorneys until the last day of trial, after Christopher had already been found guilty. According to Nicole, she was willing to come to court and testify but really did not want to testify at trial because she was scared of Fred.

¶ 100   After Christopher was convicted, Nicole and Ralph had a conversation in the courtroom gallery and, according to Nicole, she told Ralph that she was there the day it happened and if Ralph needed her to make a statement or if she could help out in any way to let her know. It is not clear whether Nicole told Ralph or any other attorneys that she saw the shooting. The only evidence that Nicole told anyone that she saw the shooting was in 2010 when she signed an affidavit.

¶ 101   After hearing Nicole's testimony during the second stage proceeding, the circuit court found that there was "no credible evidence whatsoever from Nicole that she ever spoke to the attorneys prior to trial." The court went on to say that "even if the attorneys had known what she was going to testify, which is what we heard here in court, it would clearly have been a strategic decision in this Court's opinion not to call her as a witness because her credibility is so poor, it would have hurt the defense or at least would not have aided it in any way." The court determined that Christopher's ineffective assistance of counsel claim failed because:

> "[E]ven if the defense attorneys did know her testimony, I have now heard it. I have now heard all of it, and it was so incredible, so extremely inconsistent, self-impeaching with poor demeanor, poor manner. She couldn't keep even basic facts consistent, and some of her testimony was outright nonsensical. The record in my opinion is so replete with examples of this that I don't even feel necessary to detail any of them further.
>
> So even if the attorneys had known what she was going to testify, which is what we heard here in court, it would clearly have been a strategic decision in this Court's opinion not to call her as a witness because her credibility was so poor, it would have hurt the defense or at least would not have aided it in any way. None of that falls below any objective reasonable standard. The second prong based on her incredible testimony, the

defendant cannot certainly claim that there would have been a difference, that there was any prejudice, or that the trial would have resulted in a different outcome."

¶ 102    The circuit court assessed Nicole's credibility during the second stage proceeding and determined trial counsel was not ineffective for failing to interview her. We have already noted that credibility is not an issue at the second stage of postconviction proceedings. We again note that our supreme court has made manifest that all well-pleaded factual allegations not positively rebutted by the trial record must be taken as true for purposes of the State's motion to dismiss. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006); *People v. Childress*, 191 Ill. 2d 168, 174 (2000). There is no provision in the Act for an evidentiary hearing during the second stage to screen the credibility of a witness to determine if the witness should be permitted to testify at a third stage evidentiary hearing.

¶ 103    The circuit court's evaluation of Nicole's testimony during the second stage was totally inappropriate because credibility determinations are to be made at the third stage of post-conviction proceedings. *People v. Robinson*, 2020 IL 123849, ¶ 81 (Credibility determinations are made at a third-stage evidentiary hearing, not at the second stage). The separate hearing was limited to ascertaining when Nicole told her version of events to defense counsel. Such limitation would not have occurred at the third stage evidentiary hearing. When defense counsel elicited testimony beyond the scope of the limited hearing, the circuit court reiterated the purpose of the hearing:

> "THE COURT: I don't know if it's newly-discovered. Really. Quite frankly my ruling was very specific that I wanted to hear her testimony about what was said to the attorneys. And then based on all that, I was going to hear or not hear these facts.

But I suppose for the sake of judicial economy I said I'd hear it all but if ultimately, I find based on the ineffective claims that it was not, all of this will be moot. So, you want to proceed in this fashion, I will allow you to do it"

¶ 104 We do not know the effect of the limited hearing on the elicited testimony and cannot assume that it would equate to the same testimony had it been conducted at the evidentiary hearing. Thus, we find the court erred in conducting a separate hearing and making credibility determinations on Nicole's testimony at the second stage proceeding.

¶ 105 Considering the second stage principle that we take all well-pled facts in the petition and Nicole's affidavit as true; we find Christopher made a substantial showing of ineffective assistance of counsel. The amended post-conviction petition alleged that counsel was ineffective for failing to call Nicole as a witness at trial. Nicole averred that she knew Fred was the shooter and that Christopher was not present at the time of the shooting. She told trial counsel about her observations, and counsel never called her to testify. Had counsel called Nicole to testify, Fred's taped confession may have qualified for admission under *Chambers* and the outcome would have been different at trial. Accordingly, we remand for an evidentiary hearing on this issue.

¶ 106                                    B. Third-Stage Claims

¶ 107              1. Trustworthiness of Fred's Taped Confession under *Chambers*

¶ 108 Christopher urges us to use the testimony from the evidentiary hearing to revisit the *Chambers* (*Chambers v. Mississippi*, 410 U.S. 284 (1973)), analysis from his direct appeal to render the statement by Fred "newly available." Christopher claims that "[e]ven if Fred were to invoke the Fifth and refuse to testify at a new trial, his taped confession would now be admissible under *Chambers* given the newly discovered, corroborating evidence" he presented, namely the testimony of McGee, Sanchez and Dieppa. Christopher acknowledges that this court ruled on

direct appeal that the exclusion of Fred's taped confession was proper under *Chambers* because the factors considered in determining whether a statement against penal interest should be admitted supported excluding the prior confession. However, he now claims that the new evidence presented at the evidentiary hearing "changes that equation, and inclusion of Fred's taped confession would now be proper, which would certainly change the outcome of a retrial." Christopher argues that the circuit court failed to understand this argument and improperly rejected his innocence claim by "erroneously excising Fred's confession from the analysis entirely and then considering the new evidence in a vacuum." The State argues that our consideration of this claim is barred by the doctrine of *res judicata* as Christopher's *Chambers* claim was decided on direct appeal.

¶ 109   "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22. Therefore, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised, but were not, are forfeited. *People v. Ligon*, 239 Ill. 2d 94, 103 (2010). In the interests of fundamental fairness, however, courts have recognized that *res judicata* can be relaxed in light of substantial new evidence. *People v. Patterson*, 192 Ill. 2d 93, 139 (2000). The analysis used for determining whether new evidence may relax the application of *res judicata* is the same as that used to determine whether newly discovered evidence requires a new trial. *Id*. Thus, to relax the application of *res judicata*, new evidence (1) must be of such conclusive character that it will probably change the result upon retrial, (2) must be material and not merely cumulative, and (3) " 'must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence.' " (Internal quotation marks omitted.) *Id*. (quoting *People v. Molstad*, 101 Ill. 2d 128, 134 (1984)).

¶ 110 Here, the issue of whether to admit Fred's statement into evidence was denied and that denial was affirmed on direct appeal. *People v. McAtee*, No. 1-07-1921 (unpublished order pursuant to Illinois Supreme Court Rule 23). But the issue of Fred's affidavit that he committed the murder was not previously raised on direct appeal. When this court remanded the matter to the circuit court in 2012, *People v. McAtee*, 2012 IL App (1st) 103646-U, two justices of this court recognized that Christopher's actual innocence claim should be further reviewed. (In his concurring opinion, Justice Garcia noted:

> "I write separately to make clear that on remand, the duty of appointed postconviction counsel under Supreme Court Rule 651(c) (eff. Dec. 1, 1984) is to amend the pro se petition to adequately present the defendant's constitutional claims, which may lead to the re-emergence of the affidavit from Frederick. See *People v. Johnson*, 154 Ill. 2d 227, 237-38, 609 N.E.2d 304, 182 Ill. Dec. 1 (1993) (appointed postconviction counsel has the duty to make any amendments to the pro se petition necessary to adequately present the defendant's constitutional contentions). Postconviction counsel may also add new claims in the course of amending the pro se petition in carrying out his duty to provide reasonable assistance under Rule 651(c), though he is under no obligation to raise new claims. (citing *People v. Pendleton*, 223 Ill. 2d 458, 476, 861 N.E.2d 999, 308 Ill. Dec. 434 (2006)) *McAtee*, 2012 IL App (1st) 103646-U, ¶ 25.

Justice Gordan noted:

> "Factually, defendant makes the same claim in his pro se postconviction petition as he does on this appeal: that he is actually innocent and that the information in the attached affidavits proves his innocence. [In] the trial court, defendant believed - quite reasonably for a lay person - that, since the affidavits were new, his claim met the legal standard for an actual

innocence claim based on new evidence. However, the trial court dismissed his petition as frivolous and patently without merit because the affiants - as opposed to the affidavits themselves - were previously known to defendant and thus not new for purposes of the rule." *Id.* ¶¶ 32-33.

¶ 111 The content of Fred's affidavit was new evidence. But, in considering Christopher's postconviction *Chambers* claim, the circuit court dismissed the claim at the second stage as it found it to be "entirely moot, because both the confession by Frederick Mc[A]tee on December 17, 2003, and his affidavit of July 21, 2010, are testimonial in nature" where both were "unquestionably prepared with his expectation that they would be used at a trial or a hearing" and the State was unable to cross-examine Fred in violation of *Crawford v. Washington*, 541 U.S. 36 (2004).

¶ 112 Christopher claims that, since the trial and direct appeal, new evidence supports the trustworthiness of Fred's taped confession under *Chambers*, including: (1) Fred's invocation of the fifth amendment at the evidentiary hearing; (2) Fred's 2010 affidavit stating his original confession was true; (3) Ojibaway's affidavit stating that Fred repeatedly confessed to her; (4) McGee's testimony that he saw Fred fire the shots; (5) Galambos' testimony that she saw Fred commit the crime; (6) the fact that Fred's confession said he was wearing a hooded sweatshirt with a Puerto Rican flag bandana covering his face when he fired the shots, which is consistent with the description of the shooter given by Carmen, Sanchez, Dieppa, and Galambos; and (7) Nicole's sworn testimony implicating Fred.

¶ 113 We find this new evidence relaxes the application of *res judicata* because (1) as we later determine, the evidence is of such conclusive character that it will probably change the results upon retrial; (2) the evidence is material as to an essential element of the offense for which

Christopher was convicted, that being whether Christopher killed the decedent; and (3) none of the evidence could have been discovered before the trial and direct appeal. Because the issue concerning Fred's taped confession surpasses the procedural bar, we next consider the merits of the issue.

¶ 114   Christopher acknowledges that the source of this alleged newly discovered evidence comes from Fred's taped confession and that this confession is not new postconviction evidence. Nevertheless, he urges us to render it newly available and must be considered in assessing his actual innocence claim. Christopher cites *People v. Edwards*, 2012 IL 111711, ¶ 38, *People v. Molstad*, 101 Ill. 2d 128, 134-45 (1984), and *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 107-08, in support of his argument that the new evidence he presented on postconviction corroborates Fred's confession and thereby changes the *Chambers* equation, rendering the taped confession newly admissible upon a retrial and therefore new for innocence purposes.

¶ 115   In *Edwards*, our supreme court concluded affidavits from alibi witnesses submitted in connection with a successive postconviction petition claiming actual innocence did not consist of newly discovered evidence because they contained information known to the defendant at the time of the trial and, thus, the affidavits "could have been discovered sooner through the exercise of due diligence." *Edwards*, 2012 IL 111711, ¶ 37. However, as for an affidavit from a codefendant, Eddie Coleman, in which he stated he "did not come forward earlier because 'all [he] cared about was [his] freedom,' " our supreme court concluded,

> "While [the defendant] obviously knew of Eddie at the time of trial, the evidence in Eddie's affidavit apparently was nevertheless 'unavailable at trial' [citation], and the evidence thus qualified as newly discovered. Eddie was a codefendant, with a fifth amendment right to

avoid self-incrimination. No amount of diligence could have forced him to violate that right if he did not choose to do so." *Id*. ¶ 38.

¶ 116   Similarly, in *Molstad* the defendant was tried with five codefendants and convicted of aggravated battery. *Molstad* 101 Ill. 2d at 130. Molstad testified that he was not present during the attack and his parents corroborated his testimony. *Id*. at 132. None of the codefendants, who were also convicted of the offense, testified at trial. *Id*. Molstad's counsel filed a posttrial motion to reopen the case, or, in the alternative, for a new trial, and provided affidavits from the five codefendants. *Id*. Each of the codefendants averred that Molstad was not present at the time of the attack. *Id*. Molstad contended that the evidence in the affidavits represented newly discovered evidence that was not available at the time of trial because the testimony would have violated the codefendant's fifth amendment right to avoid self-incrimination. *Id*. at 132-33.

¶ 117   Again, our supreme court found that the evidence presented in the affidavits was newly discovered because "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination." *Id*. at 135. The court further found that the evidence was not cumulative because the testimony of the codefendants concerned an ultimate issue of the case: who was present at the time of the attack. *Id*. The court observed that "[a]lthough Molstad offered alibi testimony at trial, the introduction of five affidavits at the posttrial stage raises additional questions concerning the trial court's verdict." *Id*.

¶ 118   Finally, in *Martinez*, 2021 IL App (1st) 190490, ¶ 113, the court considered whether an expert's report on eyewitness identification could be considered newly discovered evidence in the postconviction context. The State argued that it didn't because this evidence on eyewitness identification was available before the defendant's conviction. *Id*. We rejected the State's argument finding that because it would have "done little good for defendant to procure [the

expert's] report at the time of trial" because our supreme court's holding in *People v. Enis*, 139 Ill. 2d 264 (1990), resulted in the "common exclusion of expert testimony on eyewitness identification" at the time of the defendant's trial. *Id*. Therefore, the expert's report was newly discovered evidence. *Id*.

¶ 119 These cases reveal that when evidence is made unavailable at trial due to a defendant's inability to obtain it, the evidence may later qualify as newly discovered despite defendant's knowledge of the evidence at the time of trial. Here, the situation is that the evidence was unavailable at trial because Christopher was not able to obtain it. Fred's taped confession was not admissible, and thus unavailable, at the time of trial and direct appeal because the circuit and appellate court held there was insufficient evidence to support that the taped confession was trustworthy under *Chambers*. Since then, there has been newly discovered, corroborating evidence to support the trustworthiness of the taped confession. The fact that this case did not involve co-defendants as in *Edwards* and *Molstad* or a situation where Fred's affidavit could not be considered at the time of trial based on then existing supreme court precedent as in *Martinez* is inconsequential to the rationale in those cases. Therefore, Fred's taped confession may qualify as newly discovered now that new evidence supports the trustworthiness of the confession despite Christopher's knowledge of the taped confession at the time of trial.

¶ 120 Since we determine new evidence may render the previously inadmissible taped confession newly discovered for consideration in the actual innocence claim, we now must ascertain whether the taped confession actually constitutes newly discovered evidence by determining whether the new evidence supports the trustworthiness of Fred's taped confession under the *Chambers* analysis.

¶ 121    "[A]n unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is generally inadmissible, even though the declaration is against the declarant's penal interest." *People v. Tenney*, 205 Ill. 2d 411, 433 (2002). But "[w]here constitutional rights that directly affect the ascertainment of guilt are implicated, the hearsay rule may not be mechanically applied to defeat the ends of justice." *Id.* at 434. Illinois courts recognize an exception for statements against penal interests where "corroborating circumstances clearly indicate the trustworthiness of the statement." Ill. R. Evid. 804(b)(3) (eff. Jan. 1 2011); see also *Tenney*, 205 Ill. 2d at 433. *Chambers* set forth four factors to assist in determining the trustworthiness of a hearsay statement: (1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the defendant. *Id.* at 435 (citing *Chambers*, 410 U.S. at 300-01). "The *Chambers* factors are merely guidelines to admissibility rather than hard and fast requirements; the presence of all four factors is not a condition of admissibility." *Id.*

¶ 122    Considering both old and new evidence under the *Chambers* analysis, we find Fred's taped confession has an indicium of trustworthiness. First, Fred's confession is corroborated by his 2010 affidavit and the new witnesses implicating him as the shooter. In his 2010 affidavit, Fred averred that during the incident, he (1) was wearing a hooded sweatshirt with a Puerto Rican flag bandana covering his face, (2) fired a .357 magnum revolver six times and shot the decedent, (3) threw a coke bottle at a dark colored four-door vehicle, and (4) gave the gun to Williams who broke into the empty apartment below his home and hid the gun in a vent on the floor. These statements were corroborated by several witnesses and physical evidence. Carmen testified that the shooter was wearing a grey hooded sweatshirt with most of his face covered, Sanchez testified that the shooter

had on a sweatshirt and a bandana on his face, and Dieppa testified that the man who shot the car had a red, white, and blue bandana on his face, all of which confirm Fred's statement that he was wearing a hooded sweatshirt with a Puerto Rican flag bandana covering his face. Galambos's affidavit also confirms Fred's statement, as she averred, she saw Fred shoot the victim wearing a dark hooded sweatshirt and a red, white, and blue bandana that he pulled over his face before shooting. Young's testimony that the recovered weapon was a revolver with six spent .357 cartridge cases corroborated Fred's statement that he fired a .357 magnum revolver. Nicole testified that she saw Fred throw a bottle and shoot towards a car, and forensic photos showed that the decedent's car was a black four-door car, supporting Fred's statement that he threw a bottle at a dark colored four-door vehicle. Williams testified that he stashed the gun in a floor vent, and Young testified he found the gun in that location, corroborating Fred's statements about what he did with the gun after the shooting. This ample amount of new evidence weighs heavily on the trustworthiness of the taped confession.

¶ 123    Second, Fred's statement was self-incriminating and against his self-interest. He confessed that he shot and killed the decedent which would subject him to criminal prosecution. He also confessed to Christopher's defense counsel rather than the State suggesting there is less likelihood that he would gain anything from his confession. Third, the State had an opportunity to cross-examine Fred on the veracity of the taped confession when he testified at the evidentiary hearing. Therefore, we hold Fred's taped confession carries an assurance of trustworthiness given the new evidence and the taped confession, once held unreliable and thereby inadmissible at trial, is now newly discovered for consideration in the actual innocence claim.

¶ 124                                    2. Actual Innocence Claim

¶ 125   At a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92. The circuit court has wide discretion in deciding what evidence to consider (*People v. Coleman*, 206 Ill. 2d 261, 278 (2002)) and acts as the finder of fact at the evidentiary hearing, resolving any conflicts in the evidence and determining the credibility of witnesses and the weight to be given particular testimony. *Domagala*, 2013 IL 113688, ¶ 34. The circuit court's decision following an evidentiary hearing, where fact-finding and credibility determinations are involved, will not be reversed unless it is manifestly erroneous (*English*, 2013 IL 112890, ¶ 23), that is, unless the opposite conclusion is clearly evident, plain and indisputable. *Coleman*, 2013 IL 113307, ¶ 98. However, if no fact finding or credibility determinations were involved, then our review of a third stage dismissal is *de novo*. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 126   The parties disagree on the standard of review. As stated, the court dismissed Christopher's petition on the State's motion for a directed finding at the third stage proceeding. Citing *People v. Serrano*, 2016 IL App (1st) 133493, and *People v. Montanez*, 2016 IL App (1st) 133726, Christopher argues that because the circuit court rejected his actual innocence claim on directed finding at the evidentiary hearing, *de novo* review is appropriate here. He also argues that the court was required to credit his evidence and refrain from making credibility determinations. The State argues that the correct standard of review is whether the court's decisions regarding credibility determinations or fact-finding are manifestly erroneous.

¶ 127   Montanez and co-defendant Serrano were convicted of the murder of Rodrigo Vargas in 1994 and appealed from directed findings entered against them at the close of their postconviction third-stage evidentiary hearing. Their postconviction petitions were based on an affidavit from the principal witness at trial who swore that his testimony was "false in all respects" and that he was

coerced by Chicago police Detective Guevara. (Internal quotation marks removed.) *Montanez*, 2016 IL App (1st) 133726, ¶¶ 11-12. We reviewed Montanez's and Serrano's claims under a *de novo* standard, primarily because the parties agreed that *de novo* was the proper standard of review, but also because the circuit court made no fact finding or credibility determinations (*People v. Andrews*, 403 Ill. App. 3d 654, 659 (2010) (when no fact finding or credibility determinations are involved in a decision regarding a third-stage postconviction petition, we review *de novo*)) and because a ruling on a motion for a directed finding is a question of law subject to *de novo* review (*People v. Connolly*, 322 Ill. App. 3d 905, 918 (2001)). We ultimately held that Montanez and Serrano met their burden to proceed with their actual innocence claims and reversed and remanded to the circuit court to adjudicate the reinstated third stage postconviction proceedings. *Montanez*, 2016 IL App (1st) 133726, ¶ 46; *Serrano*, 2016 IL App (1st) 133493, ¶ 47.

¶ 128 Christopher's petition was similarly dismissed at the third stage following a directed finding like the petitioners' petitions in *Montanez* and *Serrano*. The State argues that the appropriate standard of review here is outlined in *People v. Williams*, 2017 IL App (1st) 152021. There, we acknowledged the general standard of review following a third stage evidentiary hearing is manifest error. *Id.* ¶ 22. Manifest error is error that is clearly plain, evident, and indisputable. *People v. Taylor*, 237 Ill. 2d 356, 373 (2010).

¶ 129 We need not decide the issue of the standard of review because the result is the same under either standard. A claim of actual innocence is not the same as a claim of insufficiency of the evidence or reasonable doubt or mere impeachment of trial witnesses, but a claim of vindication or exoneration. *People v. House*, 2015 IL App (1st) 110580, ¶ 41. To succeed on a claim of actual innocence, the petitioner must present new, material, non-cumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Sanders*, 2016 IL 118123, ¶ 24.

"Conclusive" means that the new, material, non-cumulative evidence, considered with the trial evidence, would "probably lead to a different result." *Coleman*, 2013 IL 113307, ¶ 96. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id*. at 97. A court should not redecide the defendant's guilt in deciding whether to grant relief, and the sufficiency of the evidence to convict beyond a reasonable doubt is not the determination that the court must make. *Id.* Evidence is new if it was "discovered after trial and could not have been discovered earlier through the exercise of due diligence," material if it is "relevant and probative of the petitioner's innocence," and noncumulative if it adds to the evidence heard at trial. *Id.* ¶ 96.

¶ 130 The circuit court found Christopher met the situational requirement of presenting new, material, noncumulative evidence as to McGee, Sanchez, and Dieppa.[1] As to Nicole's affidavit, the court found it was "useless or at worst harmful to the defense" suggesting the affidavit was not material. We find, however, Nicole's affidavit implicating Fred and exonerating Christopher of the murder is relevant and probative to Christopher's innocence and, thus, constitutes material evidence supporting the actual innocence claim. Therefore, the only remaining issue is whether the new evidence was so conclusive that it would probably change the result on retrial.

---

[1] The circuit court did not consider Galambos's affidavit although it was also part of the actual innocence claim in the amended postconviction petition. Because Christopher referenced Galambos's affidavit below, and now on appeal, we will consider it as part of our analysis on the actual innocence claim. Similar to Dieppa and Sanchez, Galambos averred that she responded to a flyer requesting information near Maplewood Park years after the shooting and signed an affidavit stating she saw Fred pull a bandana over his face and shoot at a car. Based on this, we find Galambos's affidavit is also new, material, and noncumulative evidence.

¶ 131   The court evaluated Christopher's evidence from the evidentiary hearing, along with the evidence presented at trial, to determine whether the evidence was so conclusive that it would probably change the result on retrial. The court found:

> "First of all, the evidence at trial was strong. Two eyewitnesses, Morris Williams and Anthony Lorenzi, testified they saw the Petitioner fire the gun at the car which contained the victim and never saw Fred Mc[a]tee shooting the gun. Both of those witnesses provided signed handwritten statements and testified before the Grand jury. Another eyewitness, Carmen Figueroa, testified that she saw the Petitioner holding the gun. The jury had a chance to consider any inconsistencies in the witness testimony and found the defendant guilty of shooting the gun that killed the victim."

¶ 132   The court then went on to find that McGee, Sanchez, and Dieppa were incredible witnesses, and questioned their motivation and the circumstances under which they came forward 18 years later. With respect to McGee's testimony, the court observed that McGee had previous felony convictions for first degree murder and "a drug case" and the court stated it was considering those convictions in assessing McGee's credibility. The court further noted that McGee prepared two affidavits in this case less than four months apart. In the first affidavit, he claimed that he saw Christopher in the kitchen in prison, and unsolicited, decided to prepare an affidavit and hand it to Christopher. The first affidavit did not mention Fred as the shooter. However, the second affidavit, which was prepared after McGee spoke with one of Christopher's attorneys, states that Fred is the shooter. The court noted other problems with McGee's version of events, highlighting that McGee's testimony contradicted "all of the other witnesses at trial and the post-conviction hearing that no other witnesses heard shots fired at 5:00 or 6:00 p.m." and "his hearing testimony directly

contradicted [his] affidavit by saying the Petitioner had already left the scene by the time Fred came out of the house." In summary, the court found that,

> "Throughout his testimony on cross-examination, I observed that Mr. McGee was evasive, irritable, and flippant. Saying things such as, quote, 'I probably was wearing a watch, but it was probably broke. I don't know.' When asked about timing. And, quote, I don't sit around counting light poles, end quote, when asked about lighting conditions. To summarize his overall testimony in plain language, Mr. McGee could not keep his story straight on even basic points and he made statements that were simply not true. These things plus his demeanor made his testimony suspect and incredible. His testimony offers no support to Petitioner."

¶ 133 The court found that "the purpose of Ms. Sanchez's testimony was obviously to say that the Petitioner was not the shooter, and that the real shooter was a man with a bandana over his face who was suppose[d] to be Fred Mc[A]tee." However, the court noted the problems with Sanchez's testimony, namely that her observations were made at night, she was inside of a car looking through the window, her view was partially obstructed by a tree, she was 200 to 300 feet away and she admitted that she "didn't see the young man very well." The court also noted Sanchez's "nonsensical answers" to questions, contradictions, and "other oddities" in her testimony. The court stated, "I could continue to recap her incredible testimony about the two affidavits she had prepared, but I think it was abundantly clear that Ms. Sanchez was not telling the truth because she never knew what the truth was." The court ultimately found Sanchez incredible and not helpful to Christopher, stating, "The dramatic ending to this whole line of questioning, after being impeached, is that Ms. Sanchez ultimately admitted she couldn't see who the shooter was, nor

could she see the person whose shoulder was being used by the shooter. Her entire testimony, quite frankly, was an embarrassment and provides absolutely no support to the Petitioner."

¶ 134   The court then assessed Maria Dieppa's testimony and found her to be "evasive [and] argumentative" and "found her entire testimony to be incredible." The court summarized Dieppa's testimony:

> "Ms. Dieppa's testimony was problematic almost from the start. On direct examination she claimed that at approximately 10:30 p.m. on a Monday night that she was walking alone through this gang invested neighborhood and sees Maplewood Park in the beautiful light of the summer moon on June 23rd, 2003, so she decides to stop and sit on a bench by herself. Soon afterwards she saw some men come out of [the building] and one of the men had a gun. They argued with other men who were in the park and who were closer to Ms. Dieppa on her bench. She said she was approximately 40 to 50 feet away from the men in the park with nothing obstructing her view. She stated they were all young man, but when asked to describe any one of them she testified she could not do so because she has a bad memory. However, from what this court observed, Ms. Dieppa seemed to have a very selective memory, which became better or worse depending on the questions being asked and who was asking them. Her testimony was full of contradictions as she often seemed to realize that she needed to modify her answers to fit the facts after making a mistake."

¶ 135   The court also remarked on Dieppa's testimony with respect to the flyer she responded to, explaining some of the reasoning for finding Dieppa's testimony incredible.

> "But saving the worst for last is the entire process in which Ms. Dieppa had two affidavits produced to be used at this hearing. First, she testified it (sic) the same cryptic manner that Ms. Sanchez did about the flier. That she was walking in the area, and she saw it on a pole

and it simply said if anyone had seen, quote, unquote, the incident, they could call the number listed. According to her, it was a remarkably vague flier with virtually no useful information. According to her, there was no description of the event for which it sought information. No year, month, or day was listed. There were no names. She insisted there was simply a phone number.

***

Nevertheless, despite the flier testimony making no sense whatsoever, Ms. Dieppa claims she decided to call the number listed and tell what she saw on the night of June 23rd, 2003, to of all people the Petitioner's mother, Carmen. When asked by the State whose suggestion it was to give her statement to the notary, Ms. Dieppa insisted that both she and Carmen made the decision together despite the fact that Ms. Dieppa had never given a statement before, nor has she ever used a notary. I also noticed during this particular line of questioning, her demeanor was unnecessarily defensive.

This phone call led to her having two affidavits prepared just like Ms. Sanchez did. She went with Petitioner's mother to a bilingual notary where Ms. Dieppa told her story in Spanish. Yet oddly enough the notary prepared the affidavit in English. Ms. Dieppa testified that she gave her entire statement at a currency exchange through the thick glass window and that the notary typed it up from behind the glass as Ms. Dieppa stood in the customer area the entire time. It just doesn't make any sense. The whole story about the flier and the affidavits never made sense. And the attempts to avoid answering direct questions about them, just made them seem more incredible."

¶ 136 The court then granted the State's motion for a directed finding and dismissed Christopher's amended petition for postconviction relief, stating that the testimony presented by

50

Christopher at the evidentiary hearing would definitively not change the result on retrial because "not a single witness presented by the Petitioner was credible." The court further noted that what it had summarized with respect to each witness was "certainly not to be considered an exhaustive list. There are many more examples contained in the record demonstrating that these witnesses for the petition[er] simply were not telling the truth."

¶ 137   In light of the circuit court's findings, we find it clearly evident that the evidence was so conclusive that it would probably change the result on retrial. The witnesses' testimony was undisputed and wholly consistent about what occurred at the time of the shooting, and the court's credibility findings regarding their testimony are not so critical as to render them incredible as a whole. McGee testified that, prior to the shooting, he saw Christopher and his girlfriend leave his house. He then saw a black man named Murk and a Latino man named JuJo, who McGee believed was Christopher's cousin or brother, come out of Christopher's house and begin arguing with someone across the street. Murk chased someone in the park with a bat and, shortly thereafter, JuJo fired shots. The court found McGee incredible in part because he only identified Fred as the shooter in his second affidavit after speaking with Christopher's attorney. However, McGee explained he did not tell the whole story at first because he didn't want to get mixed up in testifying.

¶ 138   Sanchez testified that she observed a man with a bandana covering his face fire a gun over someone's shoulder towards a car and that a woman grabbed Christopher and took him into the house before the man with the bandana fired the gun. Dieppa's testimony was corroborated by Sanchez who testified that a man with a bandana on his head was the shooter and that Christopher was not the shooter. The court found Sanchez and Dieppa incredible based on their obscured view of the shooting, the position of the individuals involved in the shooting, and how they reported the incident. However, these findings heavily focus on the events prior to and after the shooting and

were inconsequential to their uncontroverted testimony that they observed Christopher was not the shooter. Galambos averred that he saw Fred wearing a dark hoodie and a "red-white-and-blue" bandana shoot at a car during the incident, and Nicole averred that she witnessed Fred shoot at the victim's car. Finally, and most significantly, Fred implicated himself in the murder in a taped confession.

¶ 139 This new evidence is compelling. Although three witnesses—Carmen, Morris, and Anthony—identified Christopher as the shooter, other evidence cast doubt on their identifications. Carmen's statement to police that she ran away before the shooting started and that it was too dark and far to identify the shooter called into doubt her trial testimony that Christopher was the shooter. Morris' testimony is also met with skepticism where he admitted to being involved in the gang altercation prior to the shooting and hiding the murder weapon, he was found hiding in the closet of a vacant apartment, and the gunshot residue test results suggesting he may have come into contact with the murder weapon. Anthony was impeached with his prior testimony identifying Christopher as the shooter, but he was only sixteen years old at the time he made the prior statement and was adamant that it was untrue at trial. A fourth witness, Cindy, was unable to identify the shooter. Essentially, the evidence reveals two State witnesses that consistently identified Christopher as the shooter, one who admitted certain conditions made it difficult for her to make an identification and another who was involved in hiding the gun evidence. But there are five convincing witnesses exonerating Christopher as the shooter.

¶ 140 While the circuit court found the State presented strong evidence, it did not consider the damaging facts discrediting the trial witnesses' testimony and instead found that the jury had reconciled any inconsistencies. In considering whether the new evidence would probably change the results on retrial, a court must refrain from making a sufficiency of the evidence determination

in which the court gives deference to the jury's factual determinations. See *Coleman*, 2013 IL 113307, ¶ 97. Considering the evidence and the court's findings, we hold the court's grant of the State's motion for directed finding was manifestly erroneous and remand the actual innocence claim for a new evidentiary hearing. Hence, we find that whether we conduct a *de novo* review or whether we review this matter under the manifestly erroneous standard, the result is the same. Therefore, we do not need to decide the standard of review on the issue of the directed verdict.

¶ 141                                 C. New Judge

¶ 142   Lastly, Christopher asserts that a "new judge would serve the interests of justice." We agree. The judge who presided over Christopher's trial that began in October 2006 has since retired. A different judge presided over the recent proceedings, and Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994) gives a reviewing court the power to reassign a matter to a new judge on remand. *People v. Tally,* 2014 IL App (5th) 120349, ¶ 43. Christopher offered an abundance of evidence to support his actual innocence claim. The circuit court judge presiding over the postconviction proceedings turned a blind eye to much of the evidence, and it would be futile to remand this matter to the same judge to consider the same evidence at a properly held third stage evidentiary hearing. In this case, the court appears to be unwilling to properly weigh the evidence at a third stage hearing because the court made evidentiary findings during the second stage proceedings. Accordingly, in the exercise of discretion pursuant to supreme court rules, we find that the interests of justice would be best and most efficiently served by the case being assigned to a new judge. *People v. Montanez*, 2016 IL App (1st) 133726, ¶ 44 (Assigning matter to a different judge on remand after finding the postconviction court gave the impression that it was flatly unwilling to consider the evidence offered by petitioner). Hence, we remand this matter to the presiding judge of the criminal division for reassignment.

¶ 143                                   III. CONCLUSION

¶ 144   Based on the foregoing, we reverse the circuit court's judgment on Christopher's claims of

ineffective assistance of trial and appellate counsel and actual innocence, and we remand for a new

third stage evidentiary hearing.

¶ 145   Reversed and remanded.

PRESIDING JUSTICE TAILOR, concurring in part and dissenting in part:

¶ 146   I agree with the majority's determination to remand for an evidentiary hearing on

Christopher's claims of ineffective assistance of trial and appellate counsel for failing to

investigate and call Fred as a witness and for failing to investigate Ojibaway. However, I disagree

with: (a) the majority's decision to remand Christopher's claim of ineffective assistance of counsel

for failing to call Nicole as a witness at trial (supra ¶ 105); (b) the majority's finding that

Christopher is entitled to a new evidentiary hearing on his actual innocence claims (supra ¶141);

(c) the majority's finding that Fred's taped confession is now "newly discovered" for consideration

in his actual innocence claim (supra ¶122); and (d) the majority's determination that Christopher

is entitled to a new judge on remand (supra ¶ 143).

¶ 147   The majority has found that the circuit court's evaluation of Nicole's testimony during the

second stage to be "totally inappropriate" and that the circuit court erred in conducting a separate

hearing and making credibility determinations at the second stage. Supra ¶ 103. While I agree with

the majority that credibility determinations may not be made at the second stage (supra ¶ 103), it

appears from the record that the hearing on Christopher's claim of ineffective assistance of counsel

regarding Nicole actually occurred at the third stage, albeit in a bifurcated proceeding.

¶ 148   Discussing Nicole's affidavit, wherein she averred that she talked with Christopher's

attorneys and told them that Fred was the shooter, the court stated, "again as to these allegations it

54

comes down to a question of credibility which I find can only be resolved by hearing live testimony at the third stage." The court further found that Nicole's statement could have "raised additional reasonable doubt at trial in the favor of the petitioner" and therefore the court decided to "advance this issue for a third stage hearing as well." The court then qualified its ruling and said,

"However, for purposes of the petitioner's actual innocence claim Nicole's statements may or may not be newly discovered evidence. Whether or not I allow her to testify at a third stage hearing will depend on her, on the testimony I hear regarding ineffective assistance of trial counsel only.

So this issue will need to be handled separately, and I would suggest that you first hold a separate hearing on that before moving on to any other witness's testimony."

Neither party objected and the case was continued.

¶ 149    On the next court date, the court stated, "This is a third-stage post conviction hearing." The parties then expressed confusion as to whether the court was actually holding a "relevancy hearing regarding actual innocence." After the court read its previous ruling on the issue and some discussion ensued, the court clarified that "the focus of the hearing at least in my ruling was to focus on the question of whether or not she's credible or not about what she told the attorney." Later, the court further clarified its position on the issue stating, "I want to hear what she said to the attorneys. If it comes down to I'm finding that there was no ineffective assistance of counsel, and they knew about [her alleged possible testimony] then it's not newly-discovered and there's no ineffective assistance of counsel."

¶ 150    Regardless of how the hearing was labeled, for all intents and purposes, the trial court conducted a third-stage evidentiary hearing on the issue of whether counsel was ineffective for failing to interview Nicole, which then morphed into a hearing on Christopher's actual innocence

claim based on Nicole's affidavit. Although initially the court's intent was to determine the relevance of Nicole's testimony to the issue of Christopher's actual innocence claim based on Nicole's affidavit, the court nevertheless ultimately allowed a full-blown third stage evidentiary hearing on Christopher's ineffective assistance of counsel claim related to Nicole and his actual innocence claim based on Nicole's affidavit. Midway through Nicole's direct examination, the court stated, "[w]e are clearly into actual innocence testimony. I haven't made a determination about ineffective assistance of counsel yet." The court then proposed that Nicole "finish full testifying" and if it decided that there was no ineffective assistance of counsel, it would strike the testimony regarding actual innocence. Neither party objected. The format of the hearing, including the presentation of evidence and the State's ability to cross-examine Nicole, did not differ in any way from a traditional third stage evidentiary. Nicole's testimony regarding her conversation with Christopher's attorneys, her affidavit and what occurred on the night of the murder spans 127 pages in the record. Hence, I would treat the circuit court's evaluation of Nicole's testimony as it related to Christopher's ineffective assistance of counsel claim as if it occurred at a third stage evidentiary hearing.

¶ 151   At a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92. A circuit court's decision following an evidentiary hearing, where fact-finding and credibility determinations are involved, as occurred here, will not be reversed unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. However, if no fact finding or credibility determinations were involved, then our review of a third stage dismissal is *de novo*. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006).

¶ 152   As the majority acknowledges (supra ¶ 125), the parties disagree on the standard of review

that we should apply here. Citing *People v. Serrano*, 2016 IL App (1st) 133493, and *People v. Montanez*, 2016 IL App (1st) 133726, Christopher argues that because the circuit court rejected his actual innocence claim on directed finding at the third stage evidentiary hearing, *de novo* review is appropriate. He also argues that the court was required to credit his evidence and refrain from making credibility determinations when directing a finding. Citing *People v. Williams*, 2017 IL App (1st) 152021, the State argues that because this was a third stage evidentiary hearing, the correct standard of review is whether the court's decisions regarding credibility determinations or fact-finding are manifestly erroneous. After a discussion of the cited law, the majority has found that deciding the standard of review was not necessary because "the result is the same under either standard." Supra ¶ 128.

¶ 153    The proper standard of review in this case is whether the court's fact finding and credibility determinations were manifestly erroneous, as we have previously found in *People v. Williams*, 2017 IL App (1st) 152021. There, we acknowledged the general standard of review following a third stage evidentiary hearing is manifest error. *Id*. ¶ 22. However, we noted that Williams was attempting to apply the standard for a motion for a directed finding in a criminal trial to his third stage postconviction evidentiary hearing. In a criminal trial, "[w]hen, at the close of the State's evidence or at the close of all the evidence, the evidence is insufficient to support a finding or verdict of guilty the court may and on motion of the defendant shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal and discharge the defendant." The finding is reviewed *de novo*. *Williams*, 2017 IL App (1st) 152021 (quoting 725 ILCS 5/115-4(k) (West 2014)). However, because a postconviction proceeding is civil in nature, the petitioner presented some evidence on every element of his claim of ineffectiveness of trial counsel, and the circuit court, consistent with section 2-1110 of the Code ("In ruling on the motion [for directed

verdict under section 2-1110] the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence") considered the credibility of the alibi testimony and weighed all the evidence before concluding that the petitioner failed to establish by a preponderance of the evidence a *prima facie* case of ineffectiveness of trial counsel, the appropriate standard of review is manifest error and not *de novo*. *Id*.

¶ 154   *Serrano* and *Montanez* (*People v. Serrano*, 2016 IL App (1st) 133493; *People v. Montanez*, 2016 IL App (1st) 133726)) are factually distinguishable. We reviewed Montanez's and Serrano's claims under a *de novo* standard, primarily because the parties agreed that *de novo* was the proper standard of review, but also because the circuit court made no fact finding or credibility determinations (*People v. Andrews*, 403 Ill. App. 3d 654, 659 (2010) (when no fact finding or credibility determinations are involved in a decision regarding a third-stage postconviction petition, we review *de novo* )). The *de novo* standard of review used in *Serrano* and *Montanez* is inapplicable here as the court engaged in fact finding and made credibility determinations. The appropriate standard of review is whether the finding of the circuit court was manifestly erroneous. *Williams*, 2017 IL App (1st) 152021, ¶22.  Using this standard of review, I would find that the circuit court did not err in its credibility determinations based on the totality of the evidence presented, including evidence favorable to the State, when ruling on the State's motion for a directed finding at the third-stage evidentiary hearing.

¶ 155   Following the third stage evidentiary hearing on Christopher's claim that counsel was ineffective for failing to interview and call Nicole as a witness, the court found that counsel's decision not to call Nicole was one of trial strategy because even if defense counsel had spoken to Nicole and knew what her testimony would be, "her credibility [was] so poor, it would have hurt the defense or at least would not have aided it in any way." This finding is not manifestly

erroneous.

¶ 156   Nicole was not a credible witness and her testimony contained numerous inconsistencies. To highlight some, in her 2009 affidavit, she claimed that she spoke with defense attorneys. She did not mention speaking to any attorneys in her 2010 affidavit. Yet she testified at the hearing that she spoke with Christopher's attorney for the first time in court after Christopher was convicted. She never attempted to call or email Christopher's attorneys. She also testified that she could not recall if she ever told the attorney that Fred was the shooter and not Christiopher.

¶ 157   But even if Christopher's attorneys knew that Nicole was a potential witness, it would have been a strategic decision not to call her because she was so incredible. *People v. Arroys*, 339 Ill. App. 3d 137, 157 (2003) (It is not outside the realm of reasonable defense strategy not to call an incredible witness). Furthermore, it was not an unreasonable trial strategy to not call Nicole simply because her testimony may have carried little weight with the jury given that she is Christopher's sister. See *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) (decision not to call alibi witnesses who were the defendant's cousins was a strategic decision because testimony would have carried little weight). Because the circuit court's determination that counsel was not ineffective for failing to investigate or call Nicole as a witness was not manifestly erroneous, Christopher cannot meet his burden to establish that appellate counsel was ineffective for failing to raise this issue.

¶ 158   I would also find that Christopher failed to meet his burden to establish that he was actually innocent of murder. To succeed on a claim of actual innocence, the petitioner must present new, material, non-cumulative evidence that is so conclusive it would probably change the result on retrial. *People v. Sanders*, 2016 IL 118123. The majority has provided a thorough review of the evidence presented in support of Christopher's claims at the third stage evidentiary hearing and has described the evidence presented as "compelling." Supra ¶ 38. I disagree.

¶ 159 There is nothing manifestly erroneous about the circuit court's determination that McGee's, Sanchez's and Dieppa's testimony was incredible and that their testimony would not change the result at trial. The court provided a thorough, detailed explanation as to why each witness lacked credibility and pointed out numerous inconsistencies between their affidavits and their testimony at the hearing. The majority's finding that McGee's, Sanchez's and Dieppa's testimony was "undisputed and wholly consistent about what occurred at the time of the shooting" (supra ¶ 136) ignores the witnesses' questionable motivation and the circumstances under which they came forward 18 years after the murder, as well as their actual testimony and their ability to recall specific details of an event that occurred quickly, in the dark and from a distance 18 years ago. Furthermore, the majority's finding that "the court's credibility findings regarding their testimony are not so critical as to render them incredible as a whole" (supra ¶ 136) disregards the superior position the trial court holds in assessing the credibility of the witnesses at a third stage evidentiary hearing. As our supreme court has noted, "the post-conviction trial judge is able to observe and hear the witnesses at the evidentiary hearing and, therefore, occupies a 'position of advantage in a search for the truth' which 'is infinitely superior to that of a tribunal where the sole guide is the printed record.' " *People v. Coleman*, 183 Ill. 2d 366, 384 (1998) (quoting *Johnson v. Fulkerson*, 12 Ill. 2d 69, 75 (1957)). The majority is merely substituting its judgment for that of the trial court which the law does not allow. *People v. Chatman*, 357 Ill. App. 3d 695, 704 (2005).

¶ 160 As previously discussed at length, the trial court heard testimony from McGee, Sanchez and Dieppa that related to Christopher's actual innocence claim. The court evaluated their testimony along with the evidence presented at trial to determine that the evidence Christopher presented in support of his claim was not so conclusive that it would change the result on retrial. The court stated that McGee, who had previous felony convictions for first degree murder and a

"drug" case, prepared two different affidavits in this case in less than four months. His testimony was inconsistent and incredible. In the first affidavit, he claimed that he saw Christopher in the prison kitchen, and unsolicited, decided to prepare an affidavit and hand it to Christopher. The first affidavit did not name Fred as the shooter. However, McGee's second affidavit, which was prepared after he spoke with Christopher's attorneys, named Fred as the shooter. McGee's version of events contradicted every other witness that testified at trial. For example, the court pointed out that McGee's testimony contradicted "all of the other witnesses at trial and the post-conviction hearing that no other witnesses heard shots fired at 5:00 or 6:00 p.m." and "his [post-conviction] hearing testimony directly contradicted [his] affidavit by saying [Christopher] had already left the scene by the time Fred came out of the house." The court also commented on McGee's manner and demeanor at trial, observing that he was evasive, irritable and flippant. In short, the court found that McGee could not keep his story straight and that he made statements that were simply not true.

¶ 161   Sanchez came forward 18 years after the murder in response to a remarkably vague flyer on a pole asking about "the incident" which had no description of the incident, no name of those involved in the incident, and no year, month or day of the incident. The court stated that Sanchez's testimony was "nonsensical." Sanchez's observations were made at night from the inside of a car looking through the window, her view was partially obstructed by a tree, she was 200 to 300 feet away, and she admitted that she "didn't see the young man very well." The court stated that Sanchez ultimately "admitted she couldn't see who the shooter was nor could she see the person whose shoulder was being used by the shooter." The court also found Dieppa's "entire testimony to be incredible."

¶ 162   Like Sanchez, Dieppa came forward 18 years after the murder in response to the same

61

vague flyer. She could not describe any of the young men in the park and her testimony was full of "contradictions." The court found her testimony was argumentative and non-sensical, and that her memory was selective depending on who was asking her questions. As an example of what made no sense, Dieppa testified that she decided to go sit on a park bench at 10:30 pm on a summer night by herself in a gang infested neighborhood and then remain there even after she heard shots fired. The court pointed out that she testified that she went to a bilingual notary to prepare her affidavit, but the notary prepared the affidavit in English. In addition, the court found that it did not make sense that she gave her entire statement at a currency exchange through a thick glass and the notary typed it up from behind the glass. The court's finding that Dieppa's testimony about the flyer and affidavit made no sense is not manifestly erroneous.

¶ 163   Ultimately, the court found that "not a single witness presented by [Christopher] was credible." The court provided a thorough, detailed explanation as to why each witness lacked credibility and pointed out numerous inconsistencies between their affidavits and their testimony at the hearing. Accordingly, I would conclude that the circuit court did not err when it denied Christopher's amended postconviction petition and granted the State's motion for a directed finding on Chistopher's actual innocence claims based on the testimony of Fred (who invoked his fifth amendment rights and answered no substantive questions), Nicole, McGee, Sanchez and Dieppa.

¶ 164   The majority also finds that Christopher's purported newly discovered evidence relaxes the application of *res judicata* to Christopher's *Chambers* (*Chambers v. Mississippi*, 410 U.S. 284 (1973)), claim as the new evidence "changes that equation, and inclusion of Fred's taped confession would now be proper, which would certainly change the outcome of a retrial." The majority has chosen to consider the merits of Christopher's claim because "the issue concerning

Fred's taped confession surpasses the procedural bar." Supra, ¶112.

¶ 165    The majority has found Fred's affidavit to be "new evidence" relevant to Christopher's *Chambers* claim. Supra ¶ 111. It is not. In his affidavit Fred avers that he killed Raquel. This is the same confession that he made before trial, just in a different format. The consideration of this claim is barred by the doctrine of *res judicata* because Christopher's *Chambers* claim based on Fred's confession was decided on direct appeal. The issue of whether Fred's confession was admissible under an exception to the hearsay rule as a statement against penal interest was raised at trial and on direct appeal and we affirmed the trial court's decision that the statement was inadmissible under *Chambers*. *People v. McAtee*, No. 1-07-1921 (unpublished order pursuant to Supreme Court Rule 23) ("Defendant has failed to establish three of the four *Chambers* factors. As result, we find that the trial court did not abuse its discretion in denying the admission of Fred McAtee's hearsay confession statement, because it lacked sufficient indicia of reliability.").

¶ 166    The *res judicata* bar may be relaxed in light of substantial new evidence if the new evidence establishes actual innocence in that it is (1) is of such conclusive character that it will probably change the result upon retrial, (2) is material and not merely cumulative, and (3) " 'must have been discovered since the trial and be of such character that it could not have been discovered prior to trial by the exercise of due diligence.' " *People v. Patterson*, 192 Ill. 2d 93, 139 (2000) (quoting *People v. Molstad*, 101 Ill. 2d 128, 134 (1984)). The majority has found that the *res judicata* bar should be relaxed in this case because "[(1)] the evidence is of such conclusive character that it will probably change the results upon retrial; (2) the evidence is material as to an essential element of the offense for which Christopher was convicted, that being whether Christopher killed the decedent; and (3) none of the evidence could have been discovered before the trial and direct appeal." Supra ¶112.

¶ 167 As stated, there is no dispute here that the evidence provided by McGee, Sanchez and Dieppa was discovered since trial and was material and not cumulative. However, contrary to the majority, I cannot find that their testimony was of such conclusive character that it would change the result upon retrial. Nicole, McGee, Sanchez and Dieppa were incredible witnesses and their versions of events, which they shared 18 years after the crime, came under questionable circumstances and were filled with unbelievable and contradictory testimony. Therefore, in my view, Christopher cannot overcome the *res judicata* bar with respect to his claim that Nicole's, McGee's, Sanchez's or Dieppa's testimony would change the trial court's *Chambers* analysis or the result on retrial.

¶ 168 Aside from the testimony of Nicole, McGee, Sanchez and Dieppa, Christopher also relies on other evidence he claims should be viewed as newly discovered and which allegedly supports his *Chambers* argument, including: (1) Fred's 2010 affidavit, reiterating the veracity of the original confession; (2) Fred's admission that he used a .357 magnum revolver and fired six times, which aligns with Detective Young's testimony that the recovered weapon was a revolver with six spent .357 cartridge cases; (3) Fred's revelation that right before he shot at the car, which he recalled was a dark colored four-door vehicle, he threw a coke bottle at it; and (4) Fred's confession that after the shooting, he gave the gun to Williams, the two broke into the vacant apartment below his apartment, and Williams hid the gun in a floor vent. As to the latter point, Christopher points out that Williams testified that he stashed the gun in a floor vent and Detective Young testified that he found it there. The majority points out that Christopher acknowledges that the source of this alleged newly discovered evidence is Fred's taped confession and that this confession is not new postconviction evidence, but nevertheless contends it is newly available. Supra ¶113.

¶ 169 Christopher relies on *People v. Edwards*, 2012 IL 111711, ¶ 38, *People v. Molstad*, 101 Ill.

2d 128, 134-45 (1984), and *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 107- 08, to support his argument that the new evidence he presented on postconviction corroborates Fred's confession and thereby changes the *Chambers* equation, rendering the taped confession newly admissible upon a retrial and therefore new for actual innocence purposes. The majority agrees, finding that these cases "reveal what when evidence is made unavailable at trial due to a defendant's inability to obtain it, the evidence may later qualify as newly discovered despite defendant's knowledge of the evidence at trial." Supra ¶ 118.

¶ 170   *Edwards*, *Molstad* and *Martinez* are factually distinguishable from the instant case. Unlike the witnesses in *Edwards* and *Molstad*, Fred is not a codefendant and has never been charged in this case. Fred's confession was obtained in 2003, three years before trial and his fifth amendment rights were not invoked until the evidentiary hearing on Christopher's actual innocence claim based on Fred's 2010 affidavit. Christopher was aware of Fred's exculpatory statement prior to trial and his attorneys were in actual possession of the statement. In addition, unlike *Martinez*, this is not a case where Fred's affidavit could not be considered at the time of trial based on then existing supreme court precedent. Everyone was aware of Fred's 2003 confession prior to trial. Counsel attempted to have the statement admitted but the trial court denied the request finding that it did not satisfy *Chambers*.

¶ 171   Accordingly, I would find that Christopher has not provided evidence sufficient for us to relax the *res judicata* bar here. I would therefore find that the circuit court did not err in dismissing this *Chambers* claim at the second stage where Christopher did not make a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 116688, ¶ 35 (at the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation).

¶ 172   Even if Christopher could overcome the *res judicata* bar, his claim would still fail.  Fred's

hearsay statement still lacks the *indicia* of reliability required by *Chambers*, 410 U.S. at 302. To be reliable, the evidence must meet the following requirements: 1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; 2) the statement is corroborated by other evidence; 3) the statement is self-incriminating and against the declarant's interests; and 4) there was adequate opportunity for cross-examination of the declarant. *Id*. at 300-01. Fred's statement was not made spontaneously shortly after the crime occurred. He allegedly confessed to Ojibaway in August 2003, months after the crime and then in December 2003, when he gave the recorded confession to Christopher's attorney, almost six months after the murder. Furthermore, there was no opportunity for Fred to be cross-examined. Therefore, Fred's statement lacks indicia of reliability.

¶ 173   Finally, Christopher argues that he is entitled to a different judge on remand because the circuit court, in granting the State's motion for directed verdict, has already determined that the evidence "so overwhelmingly favors [the State] that no contrary verdict based on that evidence could ever stand." *Maple v. Gustafson*, 151 Ill. 2d 445, 453 (1992). The majority has agreed and found that on remand, Christopher is entitled to have his case heard by a different judge because the circuit court "turned a blind eye to much of the evidence" that Christopher offered in support of his actual innocence claim and would be unwilling on remand to "properly weigh the evidence." Supra ¶143.

¶ 174   "There is no absolute right to a substitution of judge at a postconviction proceeding. [Citations.]" *People v. Hall*, 157 Ill. 2d 324, 331 (1993); *People v. Reyes*, 369 Ill. App. 3d 1, 25 (2006) (To obtain a substitution of judge at a postconviction proceeding, the petitioner must show that allowing the same judge to preside over the case would result in substantial prejudice). In order to establish prejudice, the petitioner "must establish animosity, hostility, ill will, or distrust

towards [the] defendant." (Internal quotation marks omitted.) *People v. Patterson*, 192 Ill. 2d 93, 131 (2000). Neither erroneous rulings (*People v. Tally*, 2014 IL App (5th) 120349, ¶ 44), nor adverse rulings (*People v. Vance*, 76 Ill. 2d 171, 178 (1979)) provide sufficient reasons to believe that the court harbors a prejudice against the defendant. Finding judicial bias is a decision that should not be made lightly. *Eychaner v. Gross*, 202 Ill. 2d 228, 279-80 (2002).

¶ 175   Christopher's request is premised upon the circuit court's assessment of the evidence he offered in support of his actual innocence claim, not on a showing of the circuit court's prejudice. Here, I would remand only on Christopher's claims of ineffective assistance of trial and appellate counsel for failing to investigate and call Fred as a witness at trial and for failing to investigate Ojibaway. The circuit court dismissed both claims at the second stage, finding Christopher's claim regarding Fred to be "moot" and his claim regarding Ojibaway to be waived. Hence, neither of these claims were subject to the State's motion for a directed verdict and the circuit court made no determinations regarding the evidence that Christopher offered to support these claims. Consequently, Christopher's reliance on *Montanez* (2016 IL App (1st) 133726, at ¶ 44 (reversing post-conviction directed finding and holding that the petition "offered up an abundance of evidence to support his claim of actual innocence. The trial court turned a blind eye to much of the evidence and also refused to admit probative, admissible evidence that, when evaluated under the proper standard, is damning")), is misplaced. Therefore, I would find no cause to assign this case to a different judge on remand.

¶ 176   In summary, I would reverse the circuit court's judgment on Christopher's claims of ineffective assistance of trial and appellate counsel for failure to investigate and call Fred McAtee and failure to investigate Sheena Ojibaway and remand for a third stage evidentiary hearing on these claims only. I would affirm the circuit court's judgment in all other respects.